In the Matter of: MONUMENTAL LIFE INSURANCE COMPANY, Industrial Life Insurance Litigation.

Mattie Bratcher, et al., Plaintiffs,

Mattie Bratcher; John Bratcher; Caroline Brown, on Behalf of Herself and All Others Similarly Situated; Mary Sue Truesdale; Maxine Cash, on Behalf of Herself and All Others Similarly Situated; Mildred Buford, Also Known as Mildred Gamlin, on Behalf of Herself and All Others Similarly Situated, Plaintiffs–Appellants,

v.

National Standard Life Insurance Company, et al., Defendants,

Monumental Life Insurance Company, Defendant–Appellee.

In the Matter of: Unitrin, Inc., Industrial Life Insurance Litigation.

Rosie Lee Cothran, et al., Plaintiffs,

Elizabeth Walker, Plaintiff–Appellant,

v.

Security Industrial Insurance Company, et al., Defendants,

Monumental Life Insurance Company, Defendant–Appellee.

In the Matter of: American National Insurance Company, Industrial Life Insurance Litigation.

Rose Mary Roach, on Behalf of Herself and All Others Similarly Situated, Plaintiff–Appellant,

v.

American National Insurance Company, Defendant–Appellee.

In the Matter of: Western & Southern Life Insurance Co., Industrial Life Insurance Litigation.

Joseph Bell, etc., et al., Plaintiffs,

Joseph Bell, Individually and on Behalf of Others Similarly Situated; Willa Ellis, Doctor; Thelma Walker Oatis, on Behalf of Themselves and All Others Similarly Situated; Alma Hyde, Plaintiffs–Appellants,

v.

Western & Southern Life Insurance Company, Defendant–Appellee.

No. 02–30540.

United States Court of Appeals, Fifth Circuit.

April 2, 2004.

Gerald Edward Meunier, Gainsburgh, Benjamin, David, Meunier & Warshauer, Stephen B. Murray, Murray Law Firm, New Orleans, LA, Joe R. Whatley, Jr., Birmingham, AL, for Plaintiff-Appellant.

Bob F. Wright, James Parkerson Roy, Donald Ray Cravins, Jr., Domengeaux, Wright, Roy & Edwards, Lafayette, LA, John J. Stoia, Jr., JoBeth Halper, Milberg, Weiss, Bershad, Hynes & Lerach, San Diago, CA, Sanford Svetcov, Milberg, Weiss, Bershad, Hynes & Lerach, San Francisco, CA, Melvin I. Weiss, Milberg,

Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, for Plaintiff-Appellant.

Andrew S. Friedman, Bonnett, Fairbourn, Friedman & Balint, Phoenix, AZ, for John Bratcher, Mattie Bratcher, Caroline Brown, Mildred Buford, Maxine Cash and Mary Sue Truesdale.

Herman Watson, Jr., Watson, Jimmerson, Givhan, Martin & McKinney, Huntsville, AL, for John Bratcher and Mattie Bratcher.

Linda Ibach Shaunessy, Asst. Atty. Gen., Jeffrey Monroe Graham, Austin, TX, for State of Texas and Texas Department of Insurance, Amici Curiae.

Joel Feldman, Jeffrey E. Crane, Sidley, Austin, Brown & Wood, Chicago, IL, Stephen H. Kupperman, Barrasso, Usdin, Kupperman, Freeman & Sarver, New Orleans, LA, for Monumental Life Insurance Co.

Andrew Jan Mytelka, Steven Carl Windsor, Greer, Herz & Adams, Galveston, TX, Anthony Joseph Rollo, Jr., McGlinchey Stafford, New Orleans, LA, for American National Insurance Co.

Thomas A. Casey, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, Joseph S. Piacun, Metairie, LA, for Western and Southern Life Insurance Co.

Even M. Tager, Craig W. Canetti, Mayer, Brown, Rowe & Maw, Victoria E. Fimea, American Council of Life Insurers, Washington, DC, for American Council of Life Insurers, Amicus Curiae.

Scott J. Cipinko, Life Insurers Council, Atlanta, GA, for Life Insurers Council, Amicus Curiae.

Norman J. Chachkin, NAACP Legal Defense & Educational Fund, New York City, for NAACP Legal Defense and Educational Fund, Inc., Amicus Curiae.

Donald J. Russell, Robbins, Russell, Englert, Orsek & Untereiner, Washington, DC, for Chamber of Commerce of The United States, Amicus Curiae.

*ON PETITION FOR REHEARING*

Before SMITH, DENNIS and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The petition for panel rehearing is DENIED, and no judge in regular active service having requested that the court be polled on rehearing en banc, the petition for rehearing en banc is DENIED. The opinion, 343 F.3d 331 (5th Cir.2003), is withdrawn for the limited purpose of making minor adjustments in the analyses contained in parts III.A, III.B, and V. Although by far the greater portion of the opinion remains intact, we now issue a new opinion, as follows:

\* \* \* \* \* \* \* \* \* \*

In what may be the ultimate negative value class action lawsuit,[1] plaintiffs challenge defendants' alleged practice of paying lower benefits and charging higher premiums to blacks in the sale of low-value life insurance. The district court denied plaintiffs' motion to certify a class pursuant to FED.R.CIV.P. 23(b)(2), finding, *inter alia*, that the majority of class members would not benefit from injunctive relief. Based primarily on *Allison v. Citgo Petro-*

---

1. A "negative value" suit is one in which class members' claims "would be uneconomical to litigate individually." *Phillips Petroleum v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *see also Castano v. Am. Tobacco Co.,* 84 F.3d 734, 748 (5th Cir.1996).

*leum Corp.,* 151 F.3d 402 (5th Cir.1998), we reverse and remand.

## I.

This is a consolidation of civil rights actions against three life insurance companies: Monumental Life Insurance Company ("Monumental"), American National Insurance Company ("ANICO"), and Western and Southern Insurance Company ("Western and Southern"). Plaintiff policyowners, all of whom are black, allege that, for decades, defendants discriminated against them in the sale and administration of low-value life insurance policies, known as industrial life policies,[2] that have face amounts of $2000 or less and require small weekly or monthly premiums. Defendants comprise over 280 companies that issued industrial life policies over a fifty- to sixty-five-year period.[3]

Plaintiffs allege two overtly discriminatory practices. First, they accuse defendants of placing blacks in industrial policies offering the same benefits as do policies sold to whites, but at a higher premium (dual rates). Second, defendants allegedly placed blacks in specially-designed substandard industrial policies providing fewer or lower benefits than do comparable plans sold to whites (dual plans). These practices are memorialized in the insurer's rate books and records, which explicitly distinguish dual rate and dual plan policies by race.[4] Although, before filing their motion for class certification, plaintiffs challenged the insurers' alleged practice of charging blacks substandard premiums because of non-racial underwriting factors, such as mental condition, occupation, socioeconomic status, educational level, living conditions, and personal habits, plaintiffs no longer complain of such pretextual underwriting procedures.

Defendants state that they issued "hundreds, perhaps thousands, of different industrial life insurance products" encompassing a countless variety of underwriting standards. It is undisputed that all companies that sold dual rate or dual plan policies have not done so since the early 1970's. Also, as early as 1988, some insurers voluntarily adjusted premiums and/or death benefits to equalize the amount of coverage per premium dollar. Still, plaintiffs estimate that over 4.5 million of the 5.6 million industrial policies issued by defendants remain in-force; many other policies have been terminated, surrendered, or paid-up without remediation.[5] Defendants' expert estimates that the ratio of terminated policies to outstanding policies is approximately five to one, meaning that slightly more than one million policies remain in-force.

Plaintiffs sued for violations of 42 U.S.C. §§ 1981 and 1982, seeking (1) an injunction

---

**2.** Defendants defend this practice on the basis that (1) the race-distinct pricing was justified; (2) the practice was approved by regulators; (3) the racially discriminatory policies were no more profitable than were those sold to whites; and (4) some of the discriminatory policies were remediated.

**3.** Over the years, defendants have acquired other insurance companies and thereby assumed blocks of in-force insurance policies issued by them. Monumental currently administers policies issued by 200 different companies, while Western and Southern administers policies issued by approximately 80 companies. ANICO has assumed an indeterminate number of in-force policies.

**4.** As an example, a 1962 ANICO rate book shows that, for a twenty-year-old black, a $500 "20 Pay Life" industrial policy charged a weekly premium of $0.41, while a twenty-year-old white paid only $0.32.

**5.** Plaintiffs allege that Monumental has not adjusted any of its dual rate or dual plan policies. ANICO adjusted one of its four discriminatory "Standard No. 3 plans."

prohibiting the collection of discriminatory premiums, (2) reformation of policies to equalize benefits, and (3) restitution of past premium overcharges or benefit underpayments. Pursuant to 28 U.S.C. § 1407, the Judicial Panel for Multidistrict Litigation ("MDL") consolidated the actions against Monumental and transferred them to the Eastern District of Louisiana for pretrial proceedings. Later, the MDL Panel took the same action with the cases against ANICO and Western and Southern.

Plaintiffs moved for certification of a class pursuant to rule 23(b)(2), requesting that class members be provided notice and opt-out rights. The district court denied certification, finding that plaintiffs' claims for monetary relief predominate over their claims for injunctive relief, making rule 23(b)(2) certification inappropriate. The court also found that, given the large number of companies and policies involved, individualized hearings were necessary to determine damages and whether claims were barred by the statute of limitations. Defendants sought, and this court granted, interlocutory review pursuant to FED. R.CIV.P. 23(f).

## II.

Defendants contend that class members cannot be readily identified by way of the class definition. A precise class definition is necessary to identify properly "those entitled to relief, those bound by the judgment, and those entitled to notice." 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.21[6], at 23–62.2 (3d

ed.2003); *see DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970). Some courts have stated that a precise class definition is not as critical where certification of a class for injunctive or declaratory relief is sought under rule 23(b)(2).[6] Where notice and opt-out rights are requested, however, a precise class definition becomes just as important as in the rule 23(b)(3) context.

■ Plaintiffs sought to certify a class comprised of "[a]ll African–Americans who own, or owned at the time of policy termination, an industrial life insurance policy that was issued as a substandard plan or at a substandard rate." Defendants argue that the plain language of that definition does not comport with the class plaintiffs seek to certify. As we have noted, before moving for certification plaintiffs had included not only blacks who had purchased dual rate or dual plan policies, but also blacks who allegedly were forced into substandard plans, or forced to pay substandard rates, through the use of non-racial underwriting factors.

In their motion for certification, plaintiffs narrowed the class, stating that "[t]he proposed class *does not* include those who may have been subjected to covert socioeconomic forms of racial discrimination." Plaintiffs specified that "the term 'substandard' applies to overt race-distinct dual premiums and plans, not to policies called substandard because of other factors such as socio-economic underwriting."

We agree with defendants' observation that, as written, the class definition includes all blacks who paid substandard

---

6. *See Battle v. Commonwealth*, 629 F.2d 269, 271 n. 1 (3d Cir.1980) ("Where ... the class action seeks only injunctive or declaratory relief, for which the notice provision of Fed. R.Civ.P. 23(c)(2) is not mandatory, the district court has even greater freedom in both the timing and specificity of its class definition"); *Rice v. City of Philadelphia*, 66 F.R.D. 17, 19 (E.D.Pa.1974) ("[T]he precise definition of the [(b)(2)] class is relatively unimportant. If relief is granted to the plaintiff class, the defendants are legally obligated to comply, and it is usually unnecessary to define with precision the persons entitled to enforce compliance....").

rates or were issued substandard plans. The definition makes no distinction between class members who purchased dual rate or dual plan policies and those forced into substandard rates or substandard plans through the use of pretextual underwriting practices. In other words, one must look to the certification motion for an adequate description of the proposed class.

Holding plaintiffs to the plain language of the class definition would be overly formalistic. In the first place, the district court, in denying certification, apparently did not consider the pretextual claims as part of the proposed class. Though referring to the "mass of policies involved" and the "differing underwriting practices among some 280 companies," the court stated that in calculating damages, individualized hearings were necessary to account for the idiosyncracies of each policy. At no point did the court suggest that individualized hearings were necessary to determine liability, as would be necessary if pretextual underwriting claims were part of the class.

Second, holding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition. District courts are permitted to limit or modify class definitions to provide the necessary precision.[7] If the class is certified on remand, we trust that the plaintiffs or district court will amend the definition accordingly.

Defendants also argue that the definition terms "own, or owned," "industrial life insurance policy," "substandard plan," and "substandard rate" are ambiguous, further complicating identification of class members. This argument, too, is overly formalistic. *See Forbush*, 994 F.2d at 1105–06.

Plaintiffs' filings in the district court clarified any ambiguities by stating that "the class is limited to industrial policies sold at a substandard (i.e., higher) rate for African–Americans and a lower rate for Caucasians, or as a substandard plan (i.e., a more costly plan) for African–Americans and a corresponding less expensive plan for Caucasians." Plaintiffs define industrial life insurance policies as "(1) policies labeled as 'industrial' or (2) those policies with a face amount of less than $2,000.00 and weekly or monthly home premium collection." Defendants were provided adequate notice and discovery by which to argue that the narrowed class cannot be certified pursuant to rule 23(b)(2).

## III.

■ We review for abuse of discretion the denial of class certification. *Jenkins v. Raymark Indus.*, 782 F.2d 468, 471–72 (5th Cir.1986). "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Allison*, 151 F.3d at 408. We review *de novo* however, the question whether the district court applied the correct legal standard. *Forbush*, 994 F.2d at 1104.

All classes must satisfy the four baseline requirements of rule 23(a): numerosity,

---

**7.** *See, e.g., Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly"); *Harris v. Gen. Dev. Corp.*, 127 F.R.D. 655, 659 (N.D.Ill.1989) ("[I]t is certainly within this court's discretion to limit or redefine the scope of the class"); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D.Ga.1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class.") (citations omitted).

commonality, typicality, and adequacy of representation.[8] FED.R.CIV.P. 23(a). Assuming these requirements are satisfied, a rule 23(b)(2) class may be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED.R.CIV.P. 23(b)(2). Plaintiffs premise rule 23(b)(2) certification on their request for an injunction prohibiting the further collection of discriminatory premiums.

## A.

■ The court observed that "many" proposed class members—those whose policies have lapsed, those whose policies have already been voluntarily adjusted by defendants, and those whose death benefits already have been paid—would not benefit from injunctive relief. The court concluded that "this is a case in which individuality overrides any bland group-think, and money becomes the prime goal ... not injunctive relief." Rule 23(b)(2) certification is improper, the court held, where the class's request for injunctive relief merely serves as a bootstrap for a claim of monetary damages.

In *Allison*, we carefully explained the statement in the advisory committee notes that rule 23(b)(2) certification "does not extend to cases in which the appropriate final relief relates exclusively or *predominantly* to money damages." FED.R.CIV.P. 23 advisory committee notes (emphasis added).[9] *Allison* did not hold, as the district court believed, that monetary relief predominates where it is the "prime goal" or a mere bootstrap to injunctive relief. Instead, "determining whether one form of relief actually predominates in some quantifiable sense is a wasteful and impossible task that should be avoided." *Allison*, 151 F.3d at 412 (citing 7A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1775, at 470 (2d ed.1986)). In other words, certification does not hinge on the subjective intentions of the class representatives and their counsel in bringing suit.[10]

Instead, *Allison* looked to the nature of the rule 23(b)(2) device in defining when monetary relief predominates. That rule's focus on injunctive and declaratory relief presumes a class best described as a "homogenous and cohesive group with few conflicting interests among its members." *Id.* at 413. Class certification centers on the defendants' alleged unlawful conduct, not on individual injury. Once monetary damages enter the picture, however, class cohesiveness is generally lost, because "[m]onetary remedies are more often related directly to the disparate merits of individual claims." *Id.* (citations omitted). Where the need to address the merits of

---

8. The district court noted that "oral argument unveiled serious adequacy of representation issues," but did not rely on this basis in denying certification.

9. *Allison*, 151 F.3d at 411–12 ("The Advisory Committee Notes make no effort to define or explain the concept. Interpreting the term literally, predominant means 'controlling, dominating, [or] prevailing.' But how that translates into a workable formula for comparing different types of remedies is not at all clear.") (citation omitted).

10. *But see Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir.2003) (expressly rejecting *Allison* and instead "focus[ing] on the language of Rule 23(b)(2) and the intent of the plaintiffs in bringing the suit"); *Robinson v. Metro–North Commuter R.R.*, 267 F.3d 147, 163–64 (2d Cir.2001) (stating that rule 23(b)(2) certification is appropriate only where "reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought" and "the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits").

individual claims requires separate hearings, the efficiency gained by class litigation is lost.

In *Allison*, therefore, we held, *id.* at 415, that monetary relief, to be viable in a rule 23(b)(2) class, must "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." Monetary relief must be incidental, meaning that it is "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."[11] *Id.* Additional hearings to resolve "the disparate merits of each individual's case" should be unnecessary. *Id.*

Of course, certification under rule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request. The question whether the proposed class members are properly seeking such relief is antecedent to the question whether that relief would predominate over money damages.

In *Bolin v. Sears Roebuck & Co.*, 231 F.3d 970 (5th Cir.2000), we considered a proposed rule 23(b)(2) class of one million consumers who claimed to seek injunctive relief, alleging that defendant had employed various unlawful practices to coerce payment of otherwise-discharged prebankruptcy debt. Before applying the *Allison* predominance test, however, we observed that "[m]ost of the class consists of individuals who do not face further harm from Sear's [*sic*] actions." *Id.* at 978. Because only a negligible proportion of

proposed class members were properly seeking injunctive relief, we held that rule 23(b)(2) certification was inappropriate.

Here, by contrast, defendants' and plaintiffs' experts estimate that between one million and 4.5 million of 5.6 million issued policies remain in-force. Although the exact number of class members continuing to pay discriminatory premiums is unknown, the proportion is sufficient, absent contrary evidence from defendants, that the class as a whole is deemed properly to be seeking injunctive relief.

### B.

*Bolin* reflects a concern that plaintiffs may attempt to "shoehorn damages actions into the Rule 23(b)(2) framework, depriving class members of notice and opt-out protections."[12] Indeed, we suggested in *Allison*, 151 F.3d at 413, that monetary relief may predominate "when its presence in the litigation suggests that the procedural safeguards of notice and opt-out are necessary." Defendants seize on this point, arguing that plaintiffs' request for notice and opt-out is a tacit admission that rule 23(b)(2) certification is inappropriate. This ignores the discretion given a district court to order notice and opt-out rights when certifying a rule 23(b)(2) class. *See* Fed.R.Civ.P. 23(d)(2).

As "fundamental requisites of the constitutional guarantees of procedural due process," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), notice and opt-out are mandatory for damage classes certified under rule 23(b)(3). Though rule 23 does not

---

11. The predomination requirement serves two basic purposes, namely the interests of class members who may wish to pursue monetary claims individually, and interests of judicial economy. *Allison*, 151 F.3d at 415.

12. *Bolin*, 231 F.3d at 976; *see also McManus v. Fleetwood Enters.*, 320 F.3d 545, 554 (5th Cir.2003) ("[C][ ]lass members would potentially receive a poor substitute for individualized money damages, without the corresponding notice and opt-out benefits of Rule 23(b)(3)....").

explicitly extend these safeguards to rule 23(b)(2) classes, due process requires the provision of notice where a rule 23(b)(2) class seeks monetary damages.[13]

■ On the other hand, there is no absolute right of opt-out in a rule 23(b)(2) class, "even where monetary relief is sought and made available." *Penson*, 634 F.2d at 994; *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 505–07 (5th Cir. Jan.1981). Under our precedent, should the class be certified on remand, class members must be provided adequate notice, and the district court should consider the possibility of opt-out rights.[14]

*Allison*'s statement that monetary relief may predominate where notice and opt-out are necessary reflects only the inescapable fact that such safeguards are most appropriate where individual issues diminish class cohesiveness. Then, conflicts among class members and issues of adequate representation are most likely to surface. Rule 23(b)(3) is the default vehicle for certification, but only because notice and opt-out rights are mandatory components. A district court is empowered by rule 23(d)(2) to provide notice and opt-out for any class action, so rule 23(b)(2) certification should not be denied on the mistaken assumption that a rule 23(b)(3) class is the only means by which to protect class members.[15]

All of this further demonstrates the futility of the district court's and dissent's inquiry as to whether the "prime goal" of the class is injunctive or monetary relief. The rule 23(b)(2) predominance requirement, by focusing on uniform relief flowing from defendants' liability, "serves essentially the same functions as the procedural safeguards and efficiency and manageability standards mandated in (b)(3) class actions." *Allison*, 151 F.3d at 414–15. Therefore, to deny certification on the basis that the damage claims would be better brought as a rule 23(b)(3) class serves no function other than to elevate form over substance.[16] Indeed, interests of judicial

---

**13.** *Allison*, 151 F.3d at 412 n. 4 (citing *Johnson v. Gen. Motors Corp.*, 598 F.2d 432, 436–38 (5th Cir.1979)); *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 994 (5th Cir. Unit B Jan.1981). The type of notice afforded to rule 23(b)(2) class members seeking monetary relief will not always be "equivalent to that required in (b)(3) actions." *Johnson*, 598 F.2d at 438.

**14.** *See Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir.1999) (contemplating the use of opt-out rights for a rule 23(b)(2) class); *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C.Cir.1997) (holding that the language of rule 23 is sufficiently flexible to afford district courts the discretion to grant opt-out rights for rule 23(b)(2) classes).

**15.** One of the dissent's two reasons for finding class certification inappropriate concerns our supposed "suggestion" that notice and opt-out rights are necessary. In *Allison*, 151 F.3d at 414, however, we explained that "[t]he fact that the predomination requirement serves to protect the rights of class members ... does not imply ... that the availability of monetary relief in a(b)(2) class action depends solely or directly on whether class members are entitled to notice or opt-out rights." As mentioned, this court's precedent requires that notice be provided where a rule 23(b)(2) class seeks damages, *see supra* note 13 and accompanying text, so it is circular for the dissent to argue notice as a basis for denying certification. Our direction to the district court to consider the possibility of opt-out rights speaks nothing as to whether such rights are necessary or even desirable.

**16.** Our view that the rule 23(b)(2) and (b)(3) devices may work in tandem is strengthened by the roots of subdivision (b)(2), which was added "to Rule 23 in 1966 primarily to facilitate the bringing of class actions in the civil rights area." 7A Charles A. Wright et al., Federal Practice and Procedure § 1775, at 470 (2d ed.1986). Before its adoption, the rules made no explicit reference to class actions involving injunctive or declaratory relief, and "there was some uncertainty whether a class action seeking one of those remedies was an

economy are best served by resolving plaintiffs' claims for injunctive and monetary relief together.

## IV.

■ Applying *Allison*'s predominance test, the district court determined that the requested monetary relief does not flow from liability to the class as a whole. The court stated that "many and a variety of hearings would be required to determined personalized harm to each individual plaintiff because of the mass of policies involved, differing underwriting practices among some 280 companies, differing built-in benefits, account dividends, and age at policy issuance."

### A.

Plaintiffs contend they seek equitable restitution in the form of a constructive trust for class members who no longer have in-force policies. By characterizing this relief as equitable, plaintiffs hope to demonstrate that that relief is inherently compatible with rule 23(b)(2) certification, thereby avoiding *Allison*'s monetary predominance inquiry. Defendants argue that plaintiffs, who never used the term "constructive trust" in the district court, are trying to "re-package" their straightforward request for damages.

Equitable monetary relief is compatible with a rule 23(b)(2) class.[17] Importantly, this pronouncement has been limited to the context of title VII backpay, a remedy designated by statute as "equitable." 42

U.S.C. § 2000e–5(g)(1); *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 218 n. 4, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Backpay is therefore unique in that it is "an integral component of Title VII's 'make whole' remedial scheme." *Allison*, 151 F.3d at 415; *see also Johnson v. Ga. Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir.1969). Not coincidentally, as compared to compensatory damages, "calculation of back pay generally involves less complicated factual determinations and fewer individual issues." *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir.2002). In *Allison*, 151 F.3d at 415, we recognized that, for this reason, backpay generally does not predominate over injunctive or declaratory relief.

It would be mistaken to presume that because backpay—a remedy readily calculable on a classwide basis—is compatible with a rule 23(b)(2) class, any other remedy designated as equitable may automatically piggyback a claim for injunctive relief. To be sure, equitable monetary remedies are less likely to predominate over a class's claim for injunctive relief, but this has more to do with the uniform character of the relief rather than with its label. Therefore, rather than decide whether plaintiffs' claim for restitution is legal or equitable in nature, we apply *Allison* and examine whether the claim predominates over the request for injunctive relief.

### B.

This is not a case in which class members are entitled to a one-size-fits-all re-

---

appropriate device for vindicating civil rights." *Id.* at 470–71. Rule 23(b)(2) was adopted to facilitate the use of injunctive relief, not to compartmentalize claims for damages under rule 23(b)(3).

17. *See Allison*, 151 F.3d at 415–16 ("If the instant case involved only claims for equitable monetary relief, *Pettway* [*v. Am. Cast. Iron*

*Pipe Co.*, 494 F.2d 211, 257 (5th Cir.1974)] would control. *Pettway*, however, did not address the availability in (b)(2) class actions of other forms of monetary relief, such as compensatory and punitive damages...."); *Pettway*, 494 F.2d at 257 ("All that need be determined is that conduct of the party opposing the class is such as makes such equitable relief appropriate.").

fund; assuming liability is established, individual damages will depend on the idiosyncracies of the particular dual rate or dual plan policy. For example, the age at which a class member purchased a dual rate policy will have an impact on how long the insured paid premiums and consequently on the amount of damages. Some policies contain built-in benefits covering occurrences outside of death, such as loss of limb; others pay periodic dividends. As we have observed, some defendants, beginning in 1988, voluntarily adjusted premiums and benefits for some policies sold on a race-distinct basis.

Plaintiffs propose using standardized formulas or restitution grids to calculate individual class members' damages. Defendants counter that "thousands" of grids must be constructed to account for the myriad of policy variations. That may be so, but the monetary predominance test does not contain a sweat-of-the-brow exception. Rather, we are guided by its command that damage calculation "should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Allison*, 151 F.3d at 415.

In the list of policy variables cited by defendants and the district court, none requires the gathering of subjective evidence.[18] This is not, for example, like

*Allison*, a title VII case in which class members' claims for compensatory and punitive damages necessarily "implicate[ ] the subjective differences of each plaintiff's circumstances." *Id.* at 417. Rather, assuming that unlawful discrimination is found, class members automatically will be entitled to the difference between what a black and a white paid for the same policy. Not coincidentally, such damages flow from liability in much the same manner that an award of backpay results from a finding of employment discrimination. *Pettway*, 494 F.2d at 256–58.

We are well aware that, as *Allison* qualifies, 151 F.3d at 415, the calculation of monetary damages should not "entail complex individualized determinations." Although it is arguable that the construction of thousands of restitution grids, though based on objective data, involves the sort of complex data manipulations forbidden by *Allison*, we read *Allison* to the contrary. The policy variables are identifiable on a classwide basis and, when sorted, are capable of determining damages for individual policyowners; none of these variables is unique to particular plaintiffs.[19] The prevalence of variables common to the class makes damage computation "virtually a mechanical task." *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 326–27 (5th Cir.1978) (quoting *Windham v. Am.*

---

18. Had plaintiffs not limited their proposed class to dual rate and dual plan policies, individual hearings would be necessary to determine whether pretextual underwriting practices were used to force the respective class members into substandard plans. In that instance, we agree with the district court that the large number of defendants and underwriting practices would be relevant to finding the predominance of monetary damages.

19. In this sense, the instant case is unlike *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 744–45 (5th Cir.2003), in which we found monetary damages predominant in a proposed rule 23(b)(3) class alleging viola-

tions of Texas's statute prohibiting the unauthorized practice of law. Non-lawyers were alleged to have used "legal skill or knowledge" in the preparation of mortgage closing documents. Whether certain practices by the non-lawyers violated the statute was determinable on a classwide basis; we explained, however, that monetary damages predominated, because the extent of these practices varied by transaction, and plaintiffs were entitled to a refund only for those practices that violated the statute. Therefore, *each* transaction had to be dissected to determine the extent of liability and damages.

*Brands, Inc.,* 565 F.2d 59, 68 (4th Cir. 1977)).[20]

Finally, defendants' records contain the information necessary to determine disparities between, on the one hand, dual rate and dual plan policies, and on the other hand, plans sold to whites. Damage calculations do not require the manipulation of data kept outside defendants' normal course of business. Defendants' complaints to the contrary are belied by the fact that, since 1988, many policies have been adjusted to account for racial disparity.

## V.

■ As noted, defendants have not sold dual plan or dual rate policies since the 1970's; some class members purchased their policies as far back as the 1940's. The district court denied certification also on the basis that individualized hearings are necessary to determine expiration of the statute of limitations for particular sets of policies. The predominance of individual issues necessary to decide an affirmative defense may preclude class certification. *Castano,* 84 F.3d at 744. Limitations is an affirmative defense. FED.R.CIV.P. 8(c); 2

JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 8.07[1], at 8–34 (3d ed.2003).

■ Although, under §§ 1981 and 1982, state law governs the substantive limitations period, federal law determines when the period accrues. *Perez v. Laredo Junior Coll.,* 706 F.2d 731, 733 (5th Cir.1983). It commences when the plaintiff either has actual knowledge of the violation or has knowledge of facts that, in the exercise of due diligence, would have led to actual knowledge.[21] State law may further toll the running of limitations. *Gartrell v. Gaylor,* 981 F.2d 254, 257 (5th Cir.1993).

■ Doubtless most class members, the majority of whom are poor and uneducated, remain unaware of defendants' discriminatory practices. Of the thirteen representative plaintiffs, defendants point to only one, Jo Ella Brown, whose claim may have expired because of actual knowledge of defendants' practices.

To hold that each class member must be deposed as to precisely when, if at all, he learned of defendants' practices would be tantamount to adopting a *per se* rule that civil rights cases involving deception or concealment cannot be certified outside a two- or three-year period.[22] *Waste Mgmt.*

---

**20.** One is left wondering in what circumstances (if any) the dissent would permit monetary damages in a rule 23(b)(2) class. Remarkably, the dissent makes no attempt to explain its view that insurance policy factors such as premium rate, issue age, and benefits paid are based on "intangible, subjective differences." *Allison,* 151 F.3d at 415. Instead, *Allison*'s statement that damages be "capable of computation by means of objective standards" is ideal for refund-type cases such as this, in which damages are calculable using factors developed and maintained in the course of defendants' business. *Id.* The dissent evidently would limit damages in rule 23(b)(2) classes to instances in which there is no variance among the "specific characteristics of each policy and policyholder," a standard that necessarily would require that each class members' damages be identical. It is

safe to say that the dissent's novel approach is unsupported by caselaw.

**21.** *E.g., Harris v. Hegmann,* 198 F.3d 153, 156–57 (5th Cir.1999); *Jensen v. Snellings,* 841 F.2d 600, 606 (5th Cir.1988).

**22.** The district court's reliance on *Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3d Cir.1998), is misplaced. The proposed class, all smokers before age nineteen, brought medical monitoring claims against defendant tobacco companies. The court, *id.* at 149, determined that individual issues existed as to the accrual of the statute of limitations, which required a determination for each plaintiff as to when "he began smoking and how much he has smoked since then." By definition, the limitations period had commenced for each and

*Holdings, Inc.*, 208 F.3d 288, 296 (1st Cir. 2000). Such a result would foreclose use of the class action device for a broad subset of claims, a result inconsistent with the efficiency aims of rule 23. Though individual class members whose claims are shown to fall outside the relevant statute of limitations are barred from recovery, this does not establish that individual issues predominate, particularly in the face of defendants' common scheme of fraudulent concealment.

Instead, defendants rely on a theory of constructive notice, arguing that widespread media reporting of the issue over the last several decades should have "excite[d] the inquiry of a reasonable person." *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir.1988). Where events receive "widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir.1980); *In re Beef Antitrust Indus. Litig.*, 600 F.2d 1148, 1170 (5th Cir.1979). The district court believed constructive notice to be an individual issue, or at least a regional one, stating that "whether a plaintiff in Michigan, as compared to a plaintiff in Louisiana, had constructive notice, is a fact issue which needs to be determined individually and not on a class-wide basis."

Whether the media reports were sufficiently publicized so as to provide constructive notice is an issue reserved for the merits. Our analysis is limited to whether this issue is determinable on a classwide basis. Had defendants provided evidence—or even alleged—that media treatment of this issue was more prevalent in some regions of the country than in others, the district court's observation that individualized hearings are required to determine the geographic reach of constructive notice might be sustainable.

The requirement of "widespread publicity," *McGovern*, 621 F.2d at 154, suggests, however, that the appropriate frame of reference is the national media market, at least for issues of national importance. Several publications listed by defendants, including the *Washington Post*, the *Wall Street Journal*, and *USA Today*, are available throughout the United States, and although many other publications are local newspapers, that fact is entirely consistent with national treatment of the issue. Neither the district court nor defendants give good reason for geographically splicing constructive notice. We therefore have no difficulty concluding that whether plaintiffs were provided constructive notice is an issue that can be decided on a classwide basis.

The order denying class certification is REVERSED, and this matter is REMANDED for further proceedings consistent with this opinion. We express no view on the district court's ultimate decision whether to certify in light of today's opinion, nor do we opine on the ultimate merits of the substantive claims.

EDITH BROWN CLEMENT, Circuit Judge, dissenting:

It is a factual determination that relief sought relates predominantly to money damages. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir.1998). It is a legal conclusion that this factual determination should control class certification. *Id.* The former factual determination is subject to a review for abuse of discretion; the latter legal conclusion is subject to *de novo* review. *Id.* This Court reviews *de*

every class member. Here, accrual of the statute of limitations is premised on defendants' common practice of concealment, so a

presumption of unawareness by the plaintiff class is warranted.

*novo* whether a district court has applied the correct factual examination to certify a class under Rule 23(b)(2). *See id.* Upon concluding that the district court has applied the correct factual examination, this Court reviews the factual findings of that examination for clear error.

The majority seems to muddle these distinct standards of review. The majority engages in *de novo* factfinding as it reviews the district court's determination that the relief sought relates predominantly to money damages. The majority does so with regard to two of the district court's findings: (1) that money damages do not flow from liability to the class as a whole; and (2) that a predominant proportion of the class does not seek injunctive relief. In setting aside these factual findings, the majority fails to show that the district court has committed clear error.

The majority acknowledges that "the district court determined that the requested monetary relief does not flow from liability to the class as a whole," and further accedes that "it is arguable" that the damages calculations "involve[ ] the sort of complex data manipulations forbidden by *Allison.* ..." Nevertheless, the majority concludes that class certification is proper merely because "variables common to the class" exist. In effect, the majority identifies a reason supporting the district court opinion—the appearance of complex damages calculations—and a reason contravening that opinion—the existence of variables common to the class. The majority then proceeds to credit the latter reason as being more credible than the former. Yet although the majority does cite this reason for its factual determination, it fails to show that the district court's finding rises to the level of clear error. Given the fact that the damages calculations appear complex, the alleged inconsistent reason does not imply that the court abused its discretion.

The second finding of fact that the majority reviews *de novo* concerns the proportion of injunctive-relief beneficiaries. The majority concludes that the proportion of injunctive-relief beneficiaries predominates the class. This is a necessary determination to grant certification under Rule 23(b)(2). *See Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 978 (5th Cir. 2000) (denying certification because "most of the class" consists of individuals who do not face further harm, and opining that because those plaintiffs have nothing to gain from an injunction, "the definition of the class shows that most of the plaintiffs are seeking only damages"); *accord* Majority Opinion, at 416 ("Because only a negligible *proportion* of proposed class members were properly seeking injunctive relief, we held [in *Bolin* ] that rule 23(b)(2) certification was inappropriate.") (emphasis added). As *Bolin* indicates, this factual "proportionality" determination can be dispositive.

Here, the Plaintiffs allege that the proportion of injunctive-relief beneficiaries constitutes over 80% of the class, whereas the Defendants assert that the proportion is only 18%. After conducting a hearing, the district court opined that the "true central relief sought by the plaintiffs [was] for monetary damages." 208 F.R.D. 571, 574 (E.D.La.2002). This finding implies that the district court discredited the Plaintiffs' factual assertion of 80%. Nothing in the record intimates that the court would have abused its discretion in only crediting the Defendants' estimate.

Unlike the finding of the district court, the majority credits the Plaintiffs' factual assertion. Were the majority to have credited only the Defendants' estimate of 18%, it would not have been able to declare that "the proportion is sufficient"; it would

not have been able to determine that the relief sought does not relate predominantly to money damages. To reach its ultimate finding of fact, then, the majority is forced to give credence to the Plaintiffs' assertion of injunctive-relief beneficiaries. Notably, the majority fails to provide any stated reason for crediting the Plaintiffs' assertion with as much weight as it does the Defendants'. It fails to explain how the district court abused its discretion on this issue.

Furthermore, even if it were unclear whether the district court only credited the Defendants' factual assertion, this would be no cause for the majority to give weight to the Plaintiffs' assertion. Because the underlying factual issue of proportionality is central to the ultimate question of fact, this Court should have at least remanded this case for clarification of this proportionality issue. On remand, the district court could specify whether it in fact did credit the Plaintiffs' assertion. A district court, rather than an appellate court, is the proper judicial forum to make findings of fact. The majority's crediting of the Plaintiffs' factual assertion regarding the proportion of injunctive-relief beneficiaries is unwarranted.

Under the applicable abuse-of-discretion standard, the majority's determination that the Plaintiffs' claims for money damages do not predominate is unjustified appellate factfinding. I respectfully dissent.