

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00106-CV

PETER G. MILNE, P.C., PETER G. MILNE,
INDIVIDUALLY, AND HEALY, MILNE & ASSOCIATES, P.C., Appellants

V.

VAL RYAN AND JOY RYAN, Appellees

On Appeal from the 4th District Court
Rusk County, Texas
Trial Court No. 2013-243

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

O P I N I O N

In this accelerated appeal,[1] Peter G. Milne (Milne), Peter G. Milne, P.C. (the PC), and Healy, Milne & Associates, P.C. (Healy), (collectively referred to as the Milne Defendants) challenge the trial court's decision to certify class-action claims brought by Val and Joy Ryan. The Ryans' claims arose from the unauthorized practice of law by Richard Hicks and his businesses, Elder Advisory Services, Elder Tax Advisory Group, LLC, and Elder Tax Advisory Services, LLC, (collectively referred to as the Hicks Defendants) and their alleged affiliation with the Milne Defendants. This appeal concerns the portion of the certification order that defined the class, certified breach of fiduciary duty and unconscionability claims against the Hicks Defendants, and certified class claims for declaratory relief against both the Hicks and Milne Defendants.

We affirm the trial court's certification of class claims of breach of fiduciary duty against the Hicks Defendants. However, we find that the Ryans failed to meet the commonality and predominance requirements with respect to the unconscionability claims and that the trial court erred in certifying claims for declaratory relief. Accordingly, we reverse the portion of the trial court's order that certified these claims.

I.      **Factual and Procedural Background**

"At the initial certification stage, the trial court is not required to try the merits of . . . the cause of action." *St. Louis Sw. Ry. Co. v. Voluntary Purchasing Grps., Inc.*, 929 S.W.2d 25, 30

---

[1]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(3) (West 2015).

(Tex. App.—Texarkana 1996, no writ). However, class representatives "must at least show some facts to support certification." *Id.* Here, the events that gave rise to the Ryans' claims, which span a decade, are critical to the parties' arguments and are, therefore, recited below.

## A.     Medicaid Eligibility Planning and Application Services

The issues in this case arose out of the business arrangement between the Hicks Defendants and the Milne Defendants to provide Medicaid eligibility and planning services. To fully understand the issues in this case, it is necessary to briefly review the law concerning Medicaid eligibility.

Title XIX of the Social Security Act of 1965 created the federal Medicaid program. Medicaid Act, Pub. L. No. 89-97, 79 Stat. 343 (1965) (codified as amended at 42 U.S.C. §§ 1396–1396w-5 (West, Westlaw through P.L. 114-49 approved Aug. 7, 2015)); *see Miller v. State Dep't of Soc. & Rehab. Servs.*, 64 P.3d 395, 399 (Kan. 2003). Medicaid is a "federal-state program designed to provide health care to the neediest individuals." *Miller*, 64 P.3d at 399 (citing *Williams v. Kansas Dep't of Soc. & Rehab. Servs.*, 899 P.2d 452, 455 (Kan. 1995)). Thus, state Medicaid programs have income eligibility limits which vary depending on the applicant's marital status and other factors. 51 Molly Dear Abshire et al., *Texas Practice Series: Elder Law* § 8:56 (2015–2016 ed.). "Because Medicaid only covers categorically needy persons, individuals do not become eligible for Medicaid assistance until they 'spend down' their private assets below a[n] income ceiling set by state statute." *Leocata ex rel. Gilbride v. Wilson-Coker*, 343 F.Supp.2d 144, 149 (D. Conn. 2004) (citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 37–40 (1981)).

Moreover, eligibility can be denied if an applicant improperly transfers assets for less than fair market value within three to five years prior to applying for Medicaid services. 42 U.S.C. § 1396p(c) (West, Westlaw through P.L. 114-49 Aug. 7, 2015). If this were not so, then applicants with assets sufficient to provide their own medical care could become eligible by simply transferring those assets to family members. Abshire, *supra* p.3, § 8:116. Yet, certain transfers can be made without running afoul of the Medicaid eligibility requirements,[2] and "[a]ny discussion of asset protection in long-term care planning logically requires an understanding of the [Medicaid] transfer rules." Laura Zdychnec, *The Perilous Path to Long-Term Care: It's Not Really about Asset Protection*, BENCH & B. MINN. (Jun. 5, 2013), http://mnbenchbar.com/2013/06/the-perilous-path-to-long-term-care-its-not-really-about-asset-protection/.[3] However, the transfer rules are complicated.[4] For this reason, many attorneys provide estate planning services to those persons

---

[2]For example, in Texas, "[m]any people in need of nursing home care receive too much income to qualify for Medicaid, but are unable to afford the astronomical cost of nursing home care." Abshire, *supra* p.3, § 8:56. "This problem was solved in the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) which contained provisions allowing for some relief from the 'income cap' by transferring income into a trust with certain provisions." *Id.* A qualifying Miller Trust accomplishes the goal of spending down assets to qualify for Medicaid. *Id.* § 8:57. "A Miller Trust must only be funded with the applicant's pension, Social Security, and other income of the individual (and accumulated income in the trust)." *Id.* "Additionally, the Miller Trust must be irrevocable and contain a provision that the State will receive all amounts remaining in the trust upon the death of the individual up to an amount equal to the total medical assistance paid by Medicaid on behalf of the individual." *Id.*

[3]In addition to the rules regarding transfers from a Medicaid recipient to other relatives, there are also unique rules regarding transfers between spouses. *See Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 479–81 (2002) (discussing "anti-pauperization" Medicaid rules governing spouses).

[4]As one commentator put it, "Federal Medicaid law alone has been described by some impressive legal minds as 'among the most intricate ever drafted by Congress,' 'almost unintelligible to the uninitiated,' and 'an aggravated assault on the English language, resistant to attempts to understand it.'" Zdychnec, *supra*.

who have an immediate family member requiring long-term care who have too many assets to meet the Medicaid eligibility requirements.[5]

At all times relevant to this case, Hicks operated a Medicaid planning and application service. As part of that operation, Hicks, who is a layman, not an attorney, helped his clients determine how to become eligible for Medicaid benefits and then assisted them with the application process. The fact that Hicks is not an attorney is at the heart of the parties' dispute in this case.

**B.      Hicks Is Enjoined from the Unauthorized Practice of Law in 2001**

In 2001, the Unauthorized Practice of Law Committee of the Supreme Court of Texas discovered Hicks' actions and sued him along with his associated businesses, Elder Advisory Services and Elder Advisory Services, Inc.[6] As a result of that lawsuit, Hicks was permanently enjoined from the unauthorized practice of law by the 114th Judicial District Court of Smith County, Texas. The September 2001 agreed permanent injunction provided:

> 1.      Defendants, Richard Hicks and Advisory Services for Mature Americans, Inc., and their officers, agents, servants, employees, and attorneys, and those persons in active concert of participation with them who receive actual notice of this Order, are hereby permanently enjoined from engaging in, or aiding or abetting any person in engaging in, the following acts, unless they are at the time of such acts: (i) an attorney duly licensed by the State of Texas, or (ii) employees

---

[5]"Medicaid planning involves taking measures to preserve one's assets in order to gain Medicaid eligibility by meeting the program's financial criteria." Andrew D. Wone, *Don't Want to Pay for Your Institutionalized Spouse? The Role of Spousal Refusal and Medicaid in Funding Long-Term Care*, 14 ELDER L.J. 485, 487 (2006). "[E]lderly couples, especially those in the middle class, face the increasing burden of nursing home expenses, as governments have taken measures to restrict Medicaid planning and control costs. As a result, elder law attorneys and their clients will look for alternative Medicaid-planning strategies to qualify for Medicaid benefits." *Id*. (footnotes omitted).

[6]Hicks testified that the Dallas chapter of the Unauthorized Practice of Law Committee determined that assisting individuals with Medicaid planning was considered practicing law without a license.

of an attorney duly licensed by the State of Texas and working under the direct and active supervision of an attorney duly licensed by the State of Texas:

(a)     preparing a qualified income trust (otherwise known as a Miller [T]rust) (referred to herein as a "Miller Trust");

(b)     preparing Powers of Attorney;

(c)     advising persons regarding the creation of a Miller Income Trust, or a Power of Attorney, provided that this restraint shall not prohibit an[y] person enjoined by this judgment from referring a person to an attorney licensed to practice law in Texas for the purpose of obtaining advice from such attorney regarding the creation of a Miller Income Trust or a Power of Attorney;

(d)     selling, advertising, mailing representations concerning, or recommending the purchase of, a Miller Trust;

(e)     preparing for any person other than Defendants documents for the creation of a Miller Trust;

(f)     providing advice to any person other than Defendants concerning a Miller Trust;

(g)     providing advice for a fee to any person other than Defendants regarding how that person, or a relative (by marriage or consanguinity) or a principal under a power of attorney, may become qualified for Medicaid benefits;

(h)     providing advice for a fee to any person other than Defendants regarding how that person, or a relative (by marriage or consanguinity) or a principal under a power of attorney, may become qualified for benefits available under any program administered by the Social Security Administration or the Texas Department of Human Services;

(i)     making case-specific recommendations for a fee to any person regarding how that person, or a relative (by marriage or consanguinity) or a principal under a power of attorney, may become eligible for Medicaid benefits;

(j)     making case-specific recommendations for a fee to any person regarding how that person, or a relative (by marriage or consanguinity) or a principal under a power of attorney, may become eligible for benefits available

6

under any program administered by the Social Security Administration or the Texas Department of Human Services;

(k)     aiding, assisting or representing applicants and recipients in procuring Medicaid benefits from the Texas Department of Human Services for a fee; and

(l)     advertising assistance in procuring Medicaid benefits for a fee by any form of media, including, but not limited to, mail, fax, internet, seminars, radio, television, newspaper, email, or by solicitation by spoken word . . . .[7]

## C.     Hicks Associates with the Milne Defendants

### 1.     The Nature of the Service

In order to continue providing Medicaid advisory and planning services, Hicks decided to associate himself with an attorney licensed by the State of Texas. Hicks testified that in 2005, he met with Milne, provided him a copy of the injunction, and "asked [Milne] multiple times [if he could] be an employee" so he could continue providing enjoined services to clients without violating the injunction. The Milne Defendants declined to hire Hicks as an employee.[8] Instead, they negotiated an oral agreement whereby (1) the Hicks Defendants, acting as independent contractors, would provide "Medicaid pre-planning and qualification services to clients" of the Milne Defendants, (2) the Milne Defendants would provide the necessary legal services, and (3) the Hicks Defendants would market the combined services. According to discovery responses provided by the Milne Defendants, Hicks operated as a "satellite office . . . for the purpose of

---

[7]As explained later in this opinion, items (a)-(l) of the injunction are referred to as "enjoined services."

[8]Peter G. Milne, PC, was formed on January 12, 2005, and dissolved on December 12, 2007, after Milne joined the Milne, Healy Law Firm. The Milne, Healy Law Firm was formed on October 4, 2006. In 2010, Peter G. Milne, PC was reinstated.

7

Medicaid planning only," clients were informed that Hicks was not a lawyer, the PC did not control the means or methods of Hicks' work, and Hicks was not authorized to give legal advice.

### 2. Advertising

Once the agreement was finalized, Hicks began marketing the combined services of the Hicks and Milne Defendants. Hicks' business cards contained the PC's logo followed by the statement "Attorney and Counselor at Law," as shown below:

PETER G. MILNE, P.C.
*Attorney and Counselor at Law*
RICHARD HICKS

Hicks created this Elder Advisory Services logo that incorporated the scales of justice and used the logo on marketing materials along with the PC's logo:



Mailers containing this logo advertised community workshops entitled "Dispelling the Myths of Medicaid" and represented Hicks as the "Elder Advisory Services Associate of Healy Milne Law Firm." Invitations to Hicks' seminars listed him as an "associate." Hicks spoke at nursing homes and hospice agencies and had a handout called "Asset Protection and Medicaid Planning: TOP TEN DO'S AND DON'TS" which referred to Elder Advisory Services as "A

8

service of Peter Milne, P.C." Patty Siehl, a Healy employee, sent emails to third parties stating, "My colleague is Richard Hicks. His company is Elder Advisory Services. He works as a consultant to our law firm, Healy Milne and Associates, P.C."

The Hicks Defendants' written marketing materials also mentioned the Milne Defendants. Hicks' brochure for the Elder Services Office contained the PC's logo on the front and stated,

> At the Elder Services Office of Peter G. Milne, P.C., we realize the confusion that comes with the Medicaid planning process. . . . **We can help**. . . . The Elder Services Office of Peter G. Milne, P.C., provides individualized services to elders and their family members. Our firm assists in determining options to meet their needs. . . .
>
> For more information, contact:
>
> PETER G. MILNE, P.C.
>
> RICHARD HICKS
>
> ELDER SERVICES OFFICE

Rhonda Toole, Hicks' secretary, testified that the Hicks Defendants had letterhead with Milne's name on it, but that both the letterhead and marketing brochure were later changed to omit Milne's name.

### 3. Operation and Fee Allocation

Hicks testified about his relationship with the Milne Defendants. According to Hicks, if potential clients contacted Hicks' office due to his marketing efforts or otherwise, Hicks received seventy-five percent of the fee paid by the client and Milne received twenty-five percent. If clients contacted Milne first, Hicks received sixty percent of the fee and Milne received the remaining forty percent. Pursuant to the oral agreement, all client checks were made payable to Milne, who

9

would then redirect the funds to Hicks.[9] Hicks stated, "MILNE paid me as a contract labor[er] (IRS Form 1099)." According to Hicks, Milne and Hicks handled their own expenses, and there was no agreement to share in joint profits or losses.[10]

Hicks stated that it was his responsibility to interview the clients and collect required documentation and data. If the client agreed to enlist the Hicks Defendants/Milne Defendants' services, the client would sign an "Elder Advisory Services Contract for Legal Services," which stated that the agreement was between the client and "Peter G. Milne, P.C. ("Attorney") and Elder Advisory Services ("Consultant")." The contract stated, "Client hereby retains and employs Attorney/Consultant to prepare a formal, written plan to assist Client in structuring Client's assets in accordance with the Medical Assistance Program guidelines for the purpose of qualifying for Medicaid benefits and assistance in implementation of desire[d] plan of choice." It also contained this disclaimer:

> Client understands that Elder Advisory Services is a satellite office of Peter G. Milne, P.C.[,] for the purpose of Medicaid planning only and client has been informed and understands that Richard Hicks and Elder Advisory Services are not attorneys and are not authorized by Peter G. Milne, P.C.[,] or the state of Texas to render legal advice [on] behalf of Peter G. Milne, P.C.

After gathering the client's assets, Hicks would draft an estate summary, which he forwarded to the client for review. Once the client approved the estate summary, Hicks' staff

---

[9]During a deposition with the Securities and Exchange Commission (SEC), Hicks testified that clients would write checks to Elder Services, Hicks would sign the checks over to Milne, Milne would deposit the checks, and finally, Milne would compensate Hicks.

[10]Hicks testified that he and Milne shared marketing, advertising, and promotion expenses, but that he did not know how much Milne spent on these endeavors because they bore these expenses independently.

10

contacted Milne to schedule a delivery of formal recommendations. According to Hicks, Milne reviewed the formal recommendations prior to delivery, clients would typically meet at Hicks' office to receive formal recommendations, and Hicks would then assist the family throughout the implementation of the plan.[11] If the client was in a nursing home, Hicks delivered the recommendations to the client personally without Milne.

### 4. The Extent of the Milne Defendants' Supervision of Hicks

The degree of supervision exercised by the Milne Defendants' over Hicks' activities is disputed and will be the subject of continued litigation. Nevertheless, Hicks admitted that all of the services he provided "were within the scope of [his] unauthorized practice of law injunction" and that, with the exception of four clients, he did not believe that he was working under Milne's direct and active supervision. Since, according to Hicks, Milne had no "clue about Medicaid," the "vast majority" of Medicaid recommendations came from Hicks, and Milne "deferred to [Hicks] throughout when it came to Medicaid eligibility planning." Thus, Hicks worked without supervision when a client simply needed a Miller Trust or assistance completing the Medicaid application, and Hicks did not share fees with Milne for these "simple services." Hicks stated that he provided these "simple services" without Milne's supervision to 125 clients who had written checks directly to the Hicks Defendants. Hicks also stated that he collected a fee for advice he rendered during Medicaid planning consultations.

---

[11]Hicks' testimony about the operation between his office and the Milne Defendants was supported by the Milne Defendants' answers to discovery requests from the Ryans. However, the Milne Defendants also claimed that "Hicks was advised that his only affiliation with Peter G. Milne, P.C., was for the purpose of Medicaid planning only."

**D.      The Ryans Engage the Hicks Defendants' Services**

In late 2007, the Ryans placed Val's parents into a nursing home called Autumn Leaves and sought advice on financially planning for their long term care. Autumn Leaves' "Medicare/Medicaid kind of specialist," Raymond Pile, referred them to Hicks. The Ryans contacted Hicks, who represented that he was an associate of the Milne Defendants, but was not a lawyer. On the PC's letterhead, Hicks wrote letters to the Ryans to explain the nature of services offered. The letters also represented that Hicks was an associate.

In response to these letters, the Ryans gathered detailed financial information and met with Hicks to review their estate planning and their plan for Val's parents' long term care. The Ryans met with Hicks at the Elder Advisory Services office. Val testified that while there, he heard Milne's name "[a]ll over. On brochures, on business cards. [Hicks] mentioned the name. Everywhere was Peter G. Milne." The Ryans discussed their financial situation with Hicks in detail. Hicks advised them about Texas marital property law, probate law, federal income tax law, and Medicare and Medicaid planning. According to Val, Hicks stated, "[Y]ou need to stay away from the government, you don't need the government to pay for anything, you need to try to do this on your own."

Hicks told the Ryans that Val's parents could not qualify for Medicaid and advised them to invest their savings in promissory notes issued by National Note of Utah. The Ryans allege that Hicks represented National Note to be a safe investment that paid a guaranteed, risk-free, twelve percent, annual return and that the promissory notes were secured by real property. According to the Ryans, Hicks told the Ryans that National Note was recommended to him by Randy Stevenson

12

of Stevenson Capital Wealth Management, LCC, as a safe and prudent investment opportunity. The Ryans invested $300,000.00 with National Note, and Hicks received a $6,000.00 commission from that company.[12]

In addition to advising the Ryans to invest in National Note, Hicks drafted wills, medical powers of attorney, and other legal documents for the Ryans in exchange for a $3,000.00 check made out to "Elder Advisory." Specifically, Hicks prepared the following legal documents:

- The Ryan Family Living Trust
- Certificate of Trust
- Marital Property Agreement
- Assignment of Personal Property
- Last Will and Testament of Valery J. Ryan
- Last Will and Testament of Joy Lanier Ryan
- Durable Power of Attorney for Management of Property and Personal Affairs for both Val and Joy
- Texas Medical Power of Attorney
- Texas Directive to Physicians and Family or Surrogates
- Warranty Deed transferring real property to the living trust
- Summary of Estate Planning Provisions.

Hicks then brought the documents in a binder to the nursing home and delivered all of the documents to the Ryans. In early 2008, Hicks met with the Ryans to review the powers of attorney that he had prepared for Val's parents and to explain the substance and legal effect of the documents. The Ryans never signed any contract with either the Milne Defendants or the Hicks Defendants and never met Milne during the process. Nevertheless, they believed that Milne was involved with the legal work conducted in their case.

---

[12]Hicks testified that National Note paid him two percent of the principal amount invested.

The Ryans later learned that National Note was nothing more than a Ponzi scheme that paid "investors" solely out of money collected from new victims.[13] In 2011, National Note ran out of funds and stopped paying the Ryans on their promissory note. In June 2012, the SEC placed National Note into receivership and filed suit against the company and its principals for violations of federal securities laws.

### E. The Ryans Sue Hicks and the Milne Defendants

As a result of the investigation into the National Note Ponzi scheme and Milne and the PC's lawsuit against Hicks,[14] the Ryans discovered in June 2013 that the Milne Defendants had not reviewed the legal documents that Hicks had prepared and that they had allegedly allowed Hicks to engage in the unauthorized practice of law.[15] The Ryans sued the Hicks Defendants, the Milne Defendants, Randy Stevenson, and Stevenson Capital Wealth Management, LLC.[16] Their petition contained detailed causes of action for negligence, common-law fraud, fraud by non-disclosure, violation of the Texas Deceptive Trade Practices Act (DTPA), breach of fiduciary duty,

---

[13]Hicks testified that he did not conduct any due diligence with respect to whether National Note would be a prudent investment.

[14]After the collapse of National Note, Milne and the PC filed suit against the Hicks Defendants and Rebecca Hicks seeking declaratory relief and monetary damages for breach of contract, fraud, embezzlement of funds, conversion, and theft. Responding to the lawsuit, Hicks admitted that he had "engaged in and provided, without Milne's knowledge, unauthorized legal services to at least one hundred and fifty (150) clients, including Medicaid pre-planning and qualification and other legal services . . . and received over $140,000 in fees which [he] did not remit to Milne." Hicks readily admitted that he "defrauded and deceived Milne and the clients." The 114th Judicial District Court for Smith County, Texas, entered judgment in the amount of $296,903.75, plus attorney fees, court costs, and prejudgment interest in favor of Milne and the Milne PC against the Hicks Defendants and Rebecca Hicks. Subsequently, Hicks was indicted on ten counts by a grand jury. The record does not reflect the exact nature of the criminal charges.

[15]They also discovered that none of the defendants were licensed to sell securities.

[16]Stevenson and Stevenson Capital are not parties to this appeal.

14

civil conspiracy, aiding and abetting, and declaratory relief that would result in the disgorgement of fees. The Ryans also alleged that Hicks was acting in the course and scope of his employment with, or as an agent, vice-principal, joint venturer, and/or partner of the Milne Defendants. In the alternative, the Ryans alleged that Hicks was acting in the course and scope of his employment with Elder Advisory Services, LLC, and Elder Tax Advisory Group, LLC, and that those entities were agents, vice-principals, joint venturers and/or partners of the Milne Defendants.

> The Ryans also brought these claims on behalf of the following proposed class:

> The class of plaintiffs which the RYANS seek to represent is composed of every individual or entity who/which paid a fee for "enjoined services" performed by HICKS since January 1, 2005. For purposes of this suit, "enjoined services" means any of the services listed in the 2001 injunction entered against HICKS by the 114th Judicial District Court of Smith County, Texas. . . .
> . . . . [The proposed class] excludes any individuals or entities who/which received services from HICKS through his affiliation with any attorney or law firms other than Peter G. Milne, Peter G. Milne, P.C.[,] and Healy, Milne & Associates, P.C.

On behalf of the class, the Ryans sought a full forfeiture of fees for services paid to Hicks in violation of the 2001 injunction, attorney fees, and costs.

Hicks filed an affidavit averring that he "acted solely in soliciting clients for National Note," that he "never acted with Milne's authority, express or implied, in soliciting clients for National Note," that "Milne was not involved in soliciting clients for National Note in any way," and that Milne received no money from Hicks' activities with National Note.[17] At the class

---

[17]However, in his deposition with the SEC, Hicks testified that Milne knew about National Note, even though he was uninvolved in that aspect of Hicks' practice. In this case, Milne also testified that he told Milne about National Note, that Milne knew that Hicks was recommending National Note to his clients, and that Milne signed documentation approving the National Note recommendation as part of the client's plan. Hicks only recommended National Note to twelve families.

15

certification proceedings, the Ryans agreed not to seek class certification on issues dealing with National Note. Instead, they asked the trial court to certify only (1) claims for breach of fiduciary duty and unconscionable conduct under the DPTA against the Hicks Defendants,[18] (2) their allegations of partnership, joint venture, joint enterprise, and civil conspiracy against the Milne Defendants, and (3) their claims for declaratory relief against both the Hicks and Milne Defendants.

### F. The Class Certification Order

The trial court appointed the Ryans to represent a class defined as "All individuals and entities who/which paid a fee for enjoined services performed by Richard Hicks since January 1, 2005," and defined the term "enjoined services" to mean "any of the services listed in the 2001 [permanent] injunction." The trial court based the class definition on the 2001 injunction, which prohibited Hicks and "those persons in active concert of participation with" him from engaging in enjoined services unless they were "(i) an attorney duly licensed by the State of Texas, or (ii) employees of an attorney duly licensed by the State of Texas and working under the direct and active supervision of an attorney duly licensed by the State of Texas."

Then, the trial court certified three separate classes using the same class definition. First, the trial court certified a class under Rule 42(b)(3) of all persons within the class definition asserting claims against the Hicks Defendants for breach of fiduciary duty and unconscionability under the DTPA. *See* TEX. R. CIV. P. 42(b)(3). Second, the trial court certified a class under Rule

---

[18]*See* TEX. BUS. & COM. CODE ANN. §§ 17.45(5), 17.50(a)(3) (West 2011).

16

42(b)(3) of all persons within the class definition asserting claims against the Milne Defendants for joint enterprise, civil conspiracy, and aiding and abetting. Finally, the trial court certified a class under Rule 42(b)(2) of all persons within the class definition seeking a declaration that all defendants violated the 2001 injunction and the extent to which any such violations entitle Plaintiffs to a refund of the fees collected by Hicks. *See* TEX. R. CIV. P. 42(b)(2). The Milne Defendants did not appeal the second class, and the Hicks Defendants did not appeal at all. Accordingly, the issues before this Court in this appeal concern only that part of the trial court's order certifying a Rule 42(b)(3) class against the Hicks Defendants and a Rule 42(b)(2) class against all defendants.

## II.     Issues Presented

On appeal, the Milne Defendants' challenge three aspects of the Rule 42(b)(3) class certification:  (1) whether the class definition is proper, or more specifically, whether it creates a fail-safe class the members of which cannot presently be ascertained; (2) whether the trial court erred in certifying class claims for breach of fiduciary duty because the Ryans do not meet the typicality requirement of Rule 42(a), *see* TEX. R. CIV. P. 42(a); and (3) whether the trial court erred in certifying class claims for unconscionability because the Ryans do not meet the typicality, commonality, or predominance requirements of Rule 42(a). The Milne Defendants also challenge the Rule 42(b)(2) mandatory class claims for declaratory relief, alleging that declaratory relief did not predominate over the monetary damages sought. In response, the Ryans argue that the Milne Defendants do not have standing to raise complaints related to certification of class claims against the Hicks Defendants.

17

**III.** **The Milne Defendants Have Standing to Challenge Certification of Claims Against the Hicks Defendants**

We must first address the Ryans' argument that the Milne Defendants lack standing to appeal the trial court's certification of claims against Hicks before discussing whether class certification of these claims was appropriate. "Texas courts have long held that an appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000). Thus, "[a]lthough [a] class certification order is ripe for appellate review, only a party with standing may seek that review." *McAllend Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 234 (Tex. 2001).

The Milne Defendants argue that the certification order affects them because the trial court certified the Ryans' claims of partnership, joint venture, joint enterprise, and civil conspiracy. The Texas Business Organizations Code provides that in certain circumstances, a partnership may be held liable for the wrongful acts and omissions of a partner and that, generally, all partners are jointly and severally liable for all obligations of the partnership. TEX. BUS. ORG. CODE ANN. §§ 152.303–.304(a) (West 2012). "Joint enterprise liability makes 'each party thereto the agent of the other and thereby . . . hold[s] each responsible for the negligent act of the other.'" *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000) (quoting *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 14 (Tex. 1974)).[19] "When two or more persons jointly engage in the commission of a

---

[19] The elements of a joint enterprise are: "'(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.'" *Able*, 35 S.W.3d at 613 (quoting RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)).

18

tort, they are jointly and severally liable." *Century 21 Page One Realty v. Naghad*, 760 S.W.2d 305, 310 (Tex. App.—Texarkana 1988, no writ). Also, "[o]nce a conspiracy is proven, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy." *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 451 (Tex. App.—Eastland 2006, pet. denied). Accordingly, "co-conspirators are each responsible for the damage the conspiracy caused." *Chu v. Hong*, 249 S.W.3d 441, 445–46 (Tex. 2008).

Here, (1) the Ryans have pled several theories by which the Milne Defendants can be held responsible for damages caused by the Hicks Defendants,[20] (2) the names of the Milne Defendants will be included in the class notice that will include the claims of partnership, joint venture, joint enterprise, and civil conspiracy, and (3) in Milne's suit against Hicks, the trial court determined that Hicks was "responsible to indemnify plaintiff and . . . to defend [Milne and the PC] in any future suits brought by defendants' National Note clients and any other clients defendants fraudulently engaged." Therefore, we find that the Milne Defendants have demonstrated that they have been adversely affected by and have standing to appeal the trial court's certification of claims against the Hick Defendants. *See Torrington*, 46 S.W.3d at 843–44 (indemnity obligation confers standing on co-defendant to challenge judgment against idemnitee); *see Cortez*, 66 S.W.3d at 235

[20]In support of their argument that certification of claims against Hicks does not adversely affect the Milne Defendants, the Ryans cite to *Bhatia v. Piedrahita*, 756 F.3d 211, 219 (2d Cir. 2014). *Bhatia* dealt with the issue of whether a non-settling defendant had standing to object to a settlement agreement between the plaintiffs and settling defendants. *Id.* at 217. Because no settlement is at issue, *Bhatia* is not directly applicable.

(finding that nonsettling defendant had standing to appeal certification of class against settling defendant where class notice mentioned nonsettling defendant and treated it as defendant).

We now turn to the merits of this appeal.

## IV. Standard of Review Applicable to Class Action Certification Orders

Under Rule 42(a) of the Texas Rules of Civil Procedure,

> [a]ll class actions must satisfy four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").

*Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 433 (Tex. 2000) (citing *See* TEX. R. CIV. P. 42(a)). "In addition to these prerequisites, class actions must satisfy at least one of [three] subdivisions of Rule 42(b)." *Id*. A class may be certified under Rule 42(b)(2) if the plaintiffs can establish the four requirements of Rule 42(a) and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." TEX. R. CIV. P. 42(b)(2). A class may be certified under Rule 42(b)(3) if the plaintiffs can establish the four requirements of Rule 42(a), and "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." TEX. R. CIV. P. 42(b)(3).

In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615–17 (1997), the United States Supreme Court observed that "Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.' Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples."[21] *Id.* at 614 (quoting FED. R. CIV. P. 23 advisory committee's notes)). By contrast, "Rule 23(b)(3) permits certification where class suit 'may nevertheless be convenient and desirable.'" *Id.* (quoting FED. R. CIV. P. 23 advisory committee's notes) Thus, Rule 23(b)(3) classes were designed to allow groups of people who had individually suffered only minimal damages to be vindicated "'by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.'" *Id.* at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). Accordingly,

> "Rule 23(b)(2) does not 'cover cases where the primary claim is for damages, but is only applicable where the relief sought is . . . predominantly injunctive or declaratory.'" *Thorn* [*v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 329 (4th Cir. 2006)] (quoting *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 595 (4th Cir. 1976)). While in Rule 23(b)(3) actions, the court will generally need to conduct individual hearings to determine the amount of damages for each plaintiff, the goal in the remedy phase of a Rule 23(b)(2) class action is "either to make a declaration about or enjoin the *defendant's actions* affecting the class as a whole, and individual hearings will not be necessary." *Id.* at 330.

*Bulmash v. Travelers Indem. Co.*, 257 F.R.D. 84, 89–90 (D. Md. 2009).

---

[21]*See Bernal*, 22 S.W.3d at 433 (holding that Rule 42 of Texas Rules of Civil Procedure is patterned after Rule 23 of Federal Rules of Civil Procedure and that "federal decisions and authorities interpreting current federal class action requirements are persuasive authority").

"The party seeking class certification has the burden to establish its right to a class action." *Bailey v. Kemper Cas. Ins. Co.*, 83 S.W.3d 840, 847 (Tex. App.—Texarkana 2002, pet. dism'd w.o.j.). It must properly define the class and meet the requirements of Rule 42 of the Texas Rules of Civil Procedure. We "review[] a trial court's decision to certify a class under an abuse of discretion standard, but do[] so without indulging every presumption in favor of the trial court's decision." *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 204–05 (Tex. 2007) (per curiam) (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002); *Bernal*, 22 S.W.3d at 434–35, 439); *see Bailey*, 83 S.W.3d at 847. "Actual conformance with Rule 42 is indispensable, and compliance with the rule must be demonstrated, not presumed." *Id.* at 205 (citing *Schein*, 102 S.W.3d at 689–90; *Bernal*, 22 S.W.3d at 434–35).

## V. Issues Relating to the Rule 42(b)(3) Class Against the Hicks Defendants for Breach of Fiduciary Duty and Unconscionability Under the DTPA

### A. Whether the Class Definition is Proper

"'[I]t is axiomatic that for a class action to be certified[,] a 'class' must exist.'" *Ford Motor Co. v. Sheldon*, 22 S.W.3d 444, 453 (Tex. 2000) (quoting *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981)). "For a class to be sufficiently defined, it must be precise: the class members must be presently ascertainable by reference to objective criteria." *Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 403 (Tex. 2000). "This means that the class should not be defined by criteria that are subjective or that require an analysis of the merits of the case." *Id.* "[W]hen the class definition is framed as a legal conclusion, the trial court has no way of ascertaining whether a given person is a member of the class until a determination of ultimate liability as to that person is made." *Id.*

22

at 404. Here, the Ryans bear "the burden to demonstrate that an identifiable class exists and is susceptible to precise definition." *Bailey*, 83 S.W.3d at 848.

As previously noted, the trial court appointed the Ryans to represent a class consisting of "[a]ll individuals and entities who/which paid a fee for enjoined services performed by Richard Hicks since January 1, 2005." In the class certification order, the trial court defined "enjoined services" to mean "any of the services listed in the 2001 injunction entered against HICKS by the 114th Judicial District Court of Smith County, Texas." The Milne Defendants first argue that the trial court's order creates a fail-safe class because the merits of the case must be addressed before the court can determine who qualifies as a plaintiff under the class definition.[22]

Specifically, they argue that the term "enjoined services," defined as the "services listed in the 2001 injunction," requires interpretation in order to determine the members of the class. The Milne Defendants reach this conclusion in three steps. First, they argue that the class is actually comprised of three types of clients, including (1) 114 "acknowledged clients" to whom the Hicks Defendants and the Milne Defendants provided joint services for which they received a fee, which they shared; (2) 219 "simple case" clients whom Milne knew about and for whom Milne authorized the Hicks Defendants to perform work and collect a fee; and (3) 127 "unacknowledged small case" clients whom Hicks hid from the Milne Defendants even though they were entitled to a portion of

---

[22]A "fail-safe" class is defined as "a class bound only by a judgment for the plaintiffs. . . . In such a case, '[a] determination that the defendant is not liable . . . obviates the class, thereby precluding the proposed class members from being bound by the judgment.'" *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 438 (Tex. 2007) (quoting *Beeson*, 22 S.W.3d at 405). Thus, fail-safe classes are improper because "Rule [42] was never meant to be an exception to the rules of res judicata or to provide a risk-free method of litigation." *Beeson*, 22 S.W.3d at 405 (alteration in original) (quoting *Daffarn v. Rousseau Assocs., Inc.*, 1976-2 Trade Cases ¶ 61, at 219 (N.D. Ind. 1976)).

the fees paid by those clients. Next, the Milne Defendants argue that for the acknowledged clients group, the trial court must determine the following before a class is properly defined: (1) whether the Milne Defendants are bound by the 2001 injunction since they were not parties to that litigation, (2) whether the trial court can interpret the 2001 injunction, and (3) whether the injunction required Hicks to be an employee of a lawyer or law firm in order to provide enjoined services, or whether he could provide such services if directly supervised by a lawyer or law firm.[23] Thus, they conclude that, at least as to the acknowledged clients group, in order to determine whether someone is a class member, the trial court will have to decide whether the Defendants are liable.

The Milne Defendants cite *Beeson* in support of this argument. *Beeson*, 22 S.W.3d at 400. There, the trial court certified a class "of producers of natural gas whose gas was taken by Intratex between 1978 and 1988 in less than ratable proportions."[24] *Id.* at 402. The Texas Supreme Court concluded that the class definition in *Beeson* was a fail-safe class because it required the court to determine whether Intratex took gas non-ratably from the class members, which was the central issue to be determined at trial. *Id.* at 405. *Beeson* does not bolster the Ryans' arguments. Instead, it demonstrates why the class definition here is proper.

In *Beeson*, a person was not a class member unless Intratex took his or her natural gas in less than ratable portions, yet, if Intratex did not take the natural gas in less than ratable portions,

---

[23]The Milne Defendants also take issue with the trial court's order, which specified that it would focus on whether their admitted failure to "employ" Hicks violated the terms of the 2001 injunction and whether the Ryans are entitled to a declaratory judgment that the Milne Defendants violated the 2001 injunction.

[24]"Texas law requires an intrastate pipeline like Intratex to buy gas without discrimination (i.e. 'ratably') from the producers selling to it at the wellhead; the law also requires the producers to produce ratably." *Beeson*, 22 S.W.3d at 400.

it was not liable. Therefore, whether a person was a class member and whether Intratex was liable to the class both depended upon whether Intratex took gas from the class members in less than ratable portions. Here, the question of whether a person is a class member is separate and distinct from the question of whether the Defendants are liable to that person. A person is a class member if he or she paid a fee for enjoined services, i.e., services listed in the 2001 injunction. But whether the Defendants are liable to the class depends on whether Hicks breached a fiduciary duty to them and whether the Milne and Hicks Defendants were involved in a joint enterprise, or civil conspiracy or whether they aided and abetted one another. Likewise, (1) whether the Milne Defendants are bound by the 2001 injunction since they were not parties to that litigation, (2) whether the trial court can interpret the 2001 injunction, and (3) whether the injunction required Hicks to be an employee of a lawyer or law firm in order to provide enjoined services, or whether he could provide such services if directly supervised by a lawyer or law firm, are issues that go towards deciding whether the Milne Defendants are liable, but are not necessary to determine if a person is or is not a class member. Consequently, class membership and liability are separate and independent issues, and this is not a fail-safe class.

"[A] class definition need not be so specific 'that every potential member can be identified at the commencement of the action,'" so long as it is defined by a set of objective criteria that does not require analysis of the merits of the case. *Sheldon*, 22 S.W.3d at 453–54 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (2d ed. 1986)). Here, the trial court defined the term enjoined services to mean "any of the services listed in the 2001 injunction." The only services listed in the injunction are the unambiguous laundry list of items in paragraphs (a)–

25

(l).  Pursuant to the class definition, the class is comprised of persons who paid a fee to Hicks since January 1, 2005, for any service listed in the permanent injunction.  The trial court can presently determine whether a potential class member paid Hicks in the relevant timeframe for advice about or for preparation of items included in paragraphs (a)–(l) of the injunction, such as Miller Trusts, powers of attorney, Medicaid benefit applications, etc.  Thus, even if the Ryans lose on the ultimate issues of liability (i.e., whether either the Hicks Defendants or the Milne Defendants violated the injunction), a class of members who paid Hicks for services listed in paragraphs (a)–(l) of the injunction during the relevant timeframe will be bound by the judgment.

Accordingly, we conclude that the class definition is presently ascertainable by objective criteria and does not require the trial court to determine that the injunction was violated in order to determine the members of the class.  We overrule the Milne Defendants' first point of error.

## A.    The Trial Court Did Not Abuse Its Discretion in Determining that Typicality Was Met

Next, the Milne Defendants argue that the Ryans' claims of breach of fiduciary duty and unconscionability against the Hicks Defendants are not typical of the claims of the class because: "[u]nlike the acknowledged clients, [the Ryans] had no contract with Hicks" and (2) while there is no evidence that Hicks stated his affiliation with the Milne Defendants to the 211 unacknowledged small case clients, the Ryans "testified that it was falsely represented to them that [the Milne Defendants] were involved" in their case.

"For a proper class certification, rule 42 requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Sw. Bell Tel. Co. v. Mktg.*

26

*on Hold, Inc.*, 308 S.W.3d 909, 919–20 (Tex. 2010) (quoting TEX. R. CIV. P. 42(a)(3)). "'[T]he test for typicality is not demanding.'" *Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 252 (Tex. App.—Corpus Christi 2008, no pet.) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)). "'A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if . . . [it is] based on the same legal theory.'" *Sw. Bell Tel. Co.*, 308 S.W.3d at 920 (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007)). "The injuries suffered need not be identical, but there must be a nexus between the injuries suffered by the representative and those suffered by the other members of the class." *Bailey*, 83 S.W.3d at 854.

In their active petition, the Ryans alleged that Hicks owed a fiduciary duty to the class that he breached by (1) failing to inform the class that he had been enjoined from the unauthorized practice of law, (2) practicing law without a license, and (3) failing to inform the class that he was sharing fees with the Milne Defendants. The petition also alleged that Hicks violated the DTPA by "[c]ommitting various unconscionable acts including practicing law without a license and in violation of an injunction from a court of competent jurisdiction."[25]

The Ryans argue that their claims arise out of the same course of conduct that affects the other members of the class—Hicks' unauthorized practice of law in violation of the injunction.

---

[25]The trial court correctly determined that the breach of fiduciary duty claim required "(a) [t]he existence of a fiduciary relationship, (b) a violation of a fiduciary obligation and (c) a resulting injury to the Class or a benefit to the Defendants." *See Blakeney v. Holmes*, No. 06-10-00075-CV, 2010 WL 4514391, at *2 (Tex. App.—Texarkana Nov. 10, 2010, pet. denied) (mem. op.) (citing *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999)). For the claim of unconscionable conduct, the trial court framed the question as follows: "Whether the defendant committed an act or practice that, to a consumer's detriment, took advantage of his lack of knowledge, ability, experience or capacity to a grossly unfair degree."

They also contend (1) that their claims are based on the same legal theories as those of the class, (2) that Hicks' conduct "provides the nexus between the injuries suffered by [the Ryans] and those suffered by the other members of the class," and (3) that the injury—payment of fees for legal work to a non-lawyer—is the same across the class. *Id.* The Ryans also argue that the idiosyncrasies of each class member's case do not defeat typicality. We agree.

Typicality "'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)). If "the evidence establishes that the class representative's claims have the same essential characteristics as those of the class as a whole," the typicality requirement has been satisfied, even where "the particular facts of each member's case may differ." *Bailey*, 83 S.W.3d at 854.

Here, we find that no abuse of discretion has been shown in the trial court's determination that the Ryans' claims and the claims of the class (1) are similar, (2) arise from Hicks' unauthorized practice of law and his provision of enjoined services, and (3) are remedied by the forfeiture of fees paid to the Hicks Defendants. We overrule the Milne Defendants' second point of error.

### C. The Ryans Fail to Meet the Commonality and Predominance Requirements With Respect to the Unconscionability Claim Against Hicks

#### 1. The Commonality And Predominance Requirements

The Milne Defendants next assert that certification of the Rule 42(b)(3) class regarding Plaintiffs' DTPA unconscionability claims are improper because the common issues of law and

28

fact do not predominate over issues only affecting individual members. Specifically, the Milne Defendants argue that because the "[d]isparities between the variety of ages, education, experience, and capacity of people who encountered the Hicks Defendants and engaged their services is relevant to elements three and four of the unconscionability claims . . . [,] [the] [a]ppellants should be permitted to explore those issues to determine viable defenses." Moreover, the Milne Defendants argue that "they should not be denied individual inquiries into whether and to what extent each of these clients, or their [legal representatives] or responsible parties on their behalf, were taken advantage of due to lack of knowledge, ability, experience, or capacity, if any."

"In determining the validity of class certification, it is . . . essential that the trial court has an understanding of the 'claims, defenses, relevant facts, and applicable substantive law.'" *Philadelphia Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 585 (Tex. App.—Fort Worth 2004, no pet.) (quoting *Bernal*, 22 S.W.3d at 435); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)). To meet the commonality requirement, there must be questions of law or fact common to the class. "A common question exists when the answer as to one class member is the same as to all." *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 622 (Tex. App.—Tyler 2000, pet. denied) (citing *Spera v. Fleming*, *Hovenkamp & Grayson*, *P.C.*, 4 S.W.3d 805, 810 (Tex. App.—Houston [14th Dist.] 1999, no pet.)). Yet, "[t]hat language is easy to misread, since '[a]ny competently crafted class complaint literally raises common "questions."'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–132 (2009)).

29

Accordingly, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id*. (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "'What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* (quoting *Nagareda*, 84 N.Y.U. L. REV., at 132). However, "[c]ommonality does not require that all questions of law and fact must be identical, but only that an issue of law or fact exists that inheres in the complaints of all class members." *Bailey*, 83 S.W.3d at 853. "A single question could provide adequate grounds for a class action." *Id.*

When a class is certified under 42(b)(3), the predominance requirement is "rigorously applied," "is one of the most stringent prerequisites to class-action certification," and "prevents class certification when complex and diverse individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present otherwise viable claims or defenses." *Pitts*, 236 S.W.3d at 205. "'The test for predominance is not whether common issues outnumber uncommon issues but . . . whether common or individual issues will be the object of most of the efforts of the litigants and the court.'"[26] *Id.* (quoting *Bernal*, 22 S.W.3d at 434). "To evaluate

---

[26]Matters pertinent to the question of whether the predominance requirement is met include:

> (A)  the interest of members of the class in individually controlling the prosecution or defense of separate actions;
> (B)  the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

predominance, [courts] identify the substantive issues that will control the litigation, assess which issues will predominate, and determine if the predominating issues are, in fact, those common to the class." *Id*. "If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate." *Peltier Enters.*, 51 S.W.3d at 622 (citing *Bernal*, 22 S.W.3d at 434). Courts "consider Rule 42(b)[3]'s predominance requirement first because it is one of the most stringent prerequisites to class certification." *Bernal*, 22 S.W.3d at 433; *see Pitts*, 236 S.W.3d at 205.

### 2. The Parties' Arguments

The Milne Defendants assert that each class member must prove that the Defendants took advantage of his or her lack of knowledge, ability, experience, or capacity to an unfair degree in order to establish unconscionability under the DTPA and that class certification does not lessen the quality of evidence required in an individual action or relax substantive burdens of proof. Given the fact that disparities exist between the "ages, education, experience, and capacity of people who encountered the Hicks Defendants and engaged their services," the proof necessary to establish each class member's claim will vary. Accordingly, they argue that common issues of law and fact do not predominate over issues only affecting individual members.

The Milne Defendants further argue that the court cannot certify a class where certification would "restrict a party from presenting viable claims or defenses without that party's consent."

---

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the difficulties likely to be encountered in the management of a class action.

TEX. R. CIV. P. 42(b)(3).

31

*Bernal*, 22 S.W.3d at 434. They posit that because certification of the Rule 42(b)(3) class with respect to the unconscionability claims would deny them the right to make individual inquiry into whether and to what extent each of the class members were taken advantage of due to a lack of knowledge, ability, experience, or capacity, certification of the class was improper.

The Ryans counter argue that the commonality and predominance requirements are met with respect to the unconscionability cause of action, damages arising therefrom, and the Milne Defendants' defenses thereto because the actionable conduct—practicing law without a license in violation of the 2001 injunction—is unconscionable as a matter of law. The Ryans cite *Oxford Finance Cos. v. Velez*, 807 S.W.2d 460, 466 (Tex. App.—Austin 1991, writ denied), in support of this argument. In that case, Plaintiff Velez, entered into a contract with Major Material Corporation to install aluminum siding on her house. *Id.* at 461. Major Material executed a lien on Velez' property to secure payment on the contract. The Oxford Finance Companies, Inc., provided the financing for Major Material's services and obtained an assignment of Major Material's contract and lien. Subsequently, a dispute arose over the work provided, and Velez stopped making payments under the contract. Oxford foreclosed on the home and sold it to Mid-Tex Investments at a foreclosure sale. *Id.* at 462.

Velez filed suit against Oxford, Major Material, and Mid-Tex. She sought a declaratory judgment that the contract, lien, and foreclosure sale were void due to alleged violations of the DTPA and the Home Solicitation Transactions Act (HSTA). Mid-Tex filed a cross-claim against Oxford, pleading that in the event the foreclosure sale was voided, it should recover the purchase price it paid to Oxford. The trial court rendered judgment in Velez' favor and held that the contract,

trust deed, lien, and foreclosure sale were void. It awarded her damages and attorney fees. The trial court also required Oxford to repay Mid-Tex the purchase price paid for the home at the foreclosure sale. *Id*. at 462.

On appeal, Oxford asserted that "the pleadings, evidence, and jury findings [were] insufficient to support the award" of damages to Mid-Tex on any theory of law. *Id*. at 465. In particular, Oxford argued that Mid-Tex failed to obtain a jury finding that "Oxford's retention of the [purchase price] would be unconscionable." *Id*. at 466. The court of appeals noted that Mid-Tex sought restitution under the doctrine of unjust enrichment and that, while unjust enrichment is not a cause of action, a party may obtain restitution under that doctrine where it can show "not only that the party from whom [it] is seeking restitution was unjustly enriched, but also that the party 'had wrongfully secured a benefit or had passively received one which it would be unconscionable for [it] to retain.'" *Id*. at 466 (quoting *Barrett v. Ferrell*, 550 S.W.2d 138, 143 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.)). The court of appeals held that Mid-Tex was entitled to judgment under that theory because, "[a]s a matter of law, Oxford's retention of the purchase price under [those] circumstances would be unconscionable."[27] *Id*.

### 3. Analysis and Resolution of the Issues

The Ryans are correct that the court of appeals in *Velez* found that Oxford's retention of the purchase price paid by Mid-Tex at the foreclosure sale after the foreclosure sale had been

---

[27]Of course, *Velez* did not decide whether Oxford's conduct was unconscionable under the DTPA, but whether Mid-Tex established that it was unconscionable for Oxford to retain the purchase price after the sale was voided in order to establish his unjust enrichment claim. We do not decide whether the term has a different definition in either of those contexts, but rather assume that the two definitions are equivalent for purposes of resolving the issues here.

voided would be unconscionable as a matter of law. Further, we acknowledge that the argument that we should likewise hold that the violation of an injunction against the unauthorized practice of law is unconscionable as a matter of law is attractive. Nevertheless, for the reasons discussed below, we cannot reach that conclusion in this case.

The lawsuit at issue in *Velez* was brought by an individual litigant, not by a class representative. This distinction is important because the DTPA defines the term unconscionable as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE ANN. § 17.45(5). The pertinent language in this case is the phrase "to a consumer's detriment." While Hicks' actions were actionable and violated the 2001 injunction, determining whether they were detrimental to any given class member requires an examination of that class member's specific situation.

For example, assume that a class member needed a Miller Trust in order to qualify for Medicaid benefits and that Hicks provided the member with a valid Miller Trust that did, in fact, render the member eligible for Medicaid funding benefits. Under this scenario, Hicks' action in drafting the Miller Trust for a fee would have violated the 2001 injunction and would have been actionable, but it would not have operated to the class member's detriment. Of course, this example assumes that a Miller Trust was needed, that Hicks could prepare a valid Miller Trust, and that preparation of the Miller Trust would not have other financial or legal consequences that would be more detrimental to the client than not obtaining the trust in the first place. Attorneys are trained not just to prepare documents, but rather to evaluate each client's unique situation,

34

including the potential consequences of a particular course of action, to advise the client on the best course of action, and then to prepare the necessary documents to implement the agreed upon action plan. Because Hicks is not trained or educated to provide such services, there is a substantial likelihood that Hicks would cause more harm than good by providing such legal services without understanding the full range of potential negative consequences of doing so. This is especially so in areas as complicated as Medicaid eligibility, financial, and estate planning. Indeed, in this case, Hicks advised the Ryans to invest $300,000.00 in a Ponzi scheme as an estate planning tool. This case clearly demonstrates why non-attorneys are prohibited from performing such tasks, and the injuries suffered by the Ryans and others are precisely the types of harm the 2001 injunction sought to avoid.

But we are not called upon to address the unauthorized practice of law; instead, we must determine whether the asserted cause of action satisfies the commonality and predominance requirements of Rule 42(b)(3). Whether Hicks violated the 2001 injunction and is subject to contempt of court for those violations is one issue; whether Hicks actually harmed the people who retained him by violating the injunction is a separate issue. Notwithstanding the significant odds against it, it is not *impossible* that Hicks could have prepared a valid Miller Trust when one was needed without creating greater problems for that client. Therefore, it cannot be said that Hicks' actions in this case operated to the detriment of each and every class member without first examining each member's specific situation.

In addition, we cannot determine with certainty that each class member would have rejected Hicks' services had they known the facts underlying the Plaintiffs' unconscionability

35

claims. This is another factor that defeats the predominance requirement. For example, in *Peltier*

*Enterprises, Inc.*, the court of appeals held that a class action could not be based on a DTPA

unconscionability claim under the facts presented there because the common questions of law and

fact did not predominate over the individual class members' claims. *Peltier Enters., Inc.*, 51

S.W.3d at 619. In that case, Peltier would sell a car to a consumer, provide dealer financing,

"shop" the note to a bank that would purchase it at a lower rate of interest, and keep the differential

as a dealer participation fee. The plaintiffs in that case alleged that the dealer participation fee was

a kickback to the dealership from the bank for giving the bank the financing business. *Id*. at 620.

The trial court certified several claims against Peltier, including an unconscionability claim under

the DTPA. *Id*. at 619–20. The court of appeals found that the cause could not be maintained as a

class action because the predominance requirement could not be met. *Id*. at 623. It reasoned,

> There must be a showing of what the consumer could have or would have done if
> he had known about the information. For example, if the consumer could not get
> financing through any other source and still wanted the car, he may have purchased
> it under the retail installment contract as written even if told of the transaction with
> the Bank. Or if the difference in payments was very small, the consumer might not
> have cared at all. Plus, there would need to be some showing of each customer's
> "knowledge, ability, experience, or capacity." A plaintiff with knowledge about
> indirect lending or with years of experience in the car-selling business would not
> be able to show that Peltier did anything that was "unconscionable."

*Id*. at 623–24 (footnote omitted).

Likewise, in *McPeters v. LexisNexis*, 11 F.Supp.3d 789 (S.D. Tex. 2014), the plaintiffs

alleged that by charging e-filing fees that were "grossly higher than those of competitors and/or

set in contravention of the Texas Government Code," LexisNexis engaged in an "'unconscionable

action or course of action'" in violation of the DTPA. *Id*. at 803 (quoting TEX. BUS. & COM. CODE

36

ANN. § 17.50(a)). The plaintiffs sought certification of a class under Rule 23(b)(3) of the Federal Rules of Civil Procedure. *Id.* The plaintiffs argued that they met the predominance requirement because the question of whether class members were taken advantage of to a grossly unfair degree based on LexisNexis's conduct was a common question and that what mattered was "the fee, not the class member." *Id.* Because the issues of whether LexisNexis's fee was higher than its competitors and whether the fee violated the Texas Government Code were capable of class-wide resolution, the plaintiffs argued that the class should be certified. *Id.*

The United States District Court for the Southern District of Texas, Houston Division, determined that "adjudicating an unconscionability claim would require an inquiry into what class members knew about the e-filing system . . . and whether, upon learning about LexisNexis's system, they would have nevertheless chosen to file and serve in the same manner." *Id.* It also found that the court would "need to inquire into whether LexisNexis's actions were the 'producing cause' of the plaintiff's injuries." *Id.* Accordingly, the court concluded that individual issues predominated over class-wide issues, and it denied class certification. *Id.* at 803–04.

In both *Peltier* and *McPeters*, the courts noted that the individual class members could have been fully aware of the facts upon which the plaintiffs' unconscionability claims were based and decided to accept the service regardless. Thus, the courts held that whether the class members suffered a detriment depended upon the individual facts of each class member's case. Likewise, in the present case, it is possible that some class members may have decided to go forward with Hicks' assistance, even if they had known of the 2001 injunction and the facts underlying the

Plaintiffs' unconscionability claim.[28]   Thus, determining whether Hicks' actions were unconscionable requires evaluation of each member's individual circumstances.

For an action to be unconscionable under the DTPA definition as a matter of law in a class-action lawsuit, the action would have to be detrimental to every class member no matter the circumstances presented.  The Ryans have not directed this Court to any Texas case, and we have found none, holding that the unauthorized practice of law is unconscionable under the DTPA as a matter of law.  "[W]e cannot rely on 'mere assurances of counsel' to conclude that the predominance and superiority requirements are, or can be, met."  *Turner*, 131 S.W.3d at 585 (quoting *Bernal*, 22 S.W.3d at 435).

"The Texas Supreme Court has mandated a cautious approach to class certification and has expressly rejected the 'certify now and worry later' approach."  *Id.* (quoting *Bernal*, 22 S.W.3d at 435).  "Although we are limited to determining whether the trial court abused its discretion in ordering class certification, the trial court's exercise of discretion cannot be supported by every presumption that can be made in its favor."  *Id.* (citing *Schein*, 102 S.W.3d at 691).  "Certification is only appropriate where the trial court can make an initial determination that the individual issues can be considered in a 'manageable, time-efficient, yet fair manner.'"  *Id.* (quoting *Bernal*, 22

---

[28]To the extent the Ryans argue that the mere payment of fees for Hicks' services was detrimental to each and every class member as a matter of law, we would note that the class members would still have paid a fee had they hired a qualified attorney to perform the work rather than Hicks.  Whether the class members suffered a detriment does not turn on whether they paid a fee, but on whether the person to whom they paid the fee harmed them by providing defective services.  The fact that he was neither qualified nor permitted to perform those services factors into the question of whether the services were defective, but it is not determinative.  Therefore, to determine whether each member actually suffered a detriment would require an analysis of each member's unique circumstances.

S.W.3d at 436). "An appellate court, in reviewing a trial court's decision, should not err in favor of certification." *Id.*

Here, we find that the Milne Defendants have demonstrated that the unconscionability cause of action itself, their defenses, and the appropriate measure of damages present individual issues that render the common questions incapable of class-wide resolution. *See Dukes*, 131 S.Ct. 2541, 2556–57. Thus, we sustain the Milne Defendants' third point of error.

## VI. Issue Relating to the Rule 42(b)(2) Class: The Trial Court Erred in Certifying Claims for Declaratory Relief

In addition to the 42(b)(3) certification, the trial court also certified a mandatory 42(b)(2) class. *See* TEX. R. CIV. P. 42(b)(2), (3). Rule 42(b)(2) of the Texas Rules of Civil Procedure provides that an action for declaratory relief may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Id.* The trial court's certification order states that it will determine "[w]hether Plaintiffs are entitled to [a] declaratory judgment that Defendants violated the 2001 injunction" and "[t]he extent to which Defendants' violation of the injunction entitles Plaintiffs to a refund of the fees collected by Hicks for [the] provision of enjoined services" "based on the undisputed fact that Hicks provided enjoined services to Class members without either becoming a lawyer or being 'employed' by a lawyer and working under a lawyer's direct and active supervision."

The Milne Defendants argue that certification under 42(b)(2) was erroneous because the only meaningful relief sought on behalf of the class was for monetary damages. They point to the

Ryans' petition, which prayed for a declaratory judgment that the Hicks and Milne Defendants violated the 2001 injunction and asked that "[a]s a result, all of the fees charged and collected for services within the scope of the 2001 injunction . . . be disgorged." We agree that certification of the Rule 42(b)(2) class is inappropriate.

### A.    Legal Requirements of Rule 42(b)(2)[29]

To begin with, a plaintiff is not required to establish Rule 42(b)(3)'s predominance requirement in a Rule 42(b)(2) certification. Instead, Rule 42(b)(2) "requires common behavior by the defendant towards the class." [30] *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012) (citing *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010)). Accordingly, in *Bailey* we noted that

> [t]he framers of the federal rule, from which the Texas rule is drawn, intended (b)(2) to "reach situations where a party has taken action or refused to take action with respect to a class and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate."

---

[29]Rule 42 (b)(2) of the Texas Rules of Civil Procedure "derives from its federal parallel, Rule 23(b)(2), and reads identically." *Lapray*, 135 S.W.3d at 664. Thus, Texas courts often look to federal court precedent in resolving issues under Rule 42 of the Texas Rules of Civil Procedure.

[30]Rule 42(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." TEX. R. CIV. P. 42(b)(3). This predominance requirement does not apply to classes certified under Rule 42(b)(2). Nevertheless, the federal cases interpreting Federal Rule 23(b)(2) use the term "predominant" when referring to the Rule 23(b)(2) requirement that "common behavior by the defendant towards the class" be shown. *See* FED. R. CIV. P. 23(b)(2); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 (5th Cir. 1998) ("We, like nearly every other circuit, have adopted the position taken by the advisory committee that monetary relief may be obtained in a (b)(2) class action so long as the predominant relief sought is injunctive or declaratory."). The Texas Supreme Court has held, "Although [Rule 42](b)(2) does not explicitly require predominance and superiority as [Rule 42](b)(3) does, [Rule 42](b)(2) does require a rigorous analysis of 'cohesiveness.' *See, e.g.*, *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (noting that '[w]hile 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive')." *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 670 (Tex. 2004) (quoting *Barnes*, 161 F.3d at 143).

*Bailey*, 83 S.W.3d at 856 (quoting FED. R. CIV. P. 23 (advisory committee notes)). The United

States Supreme Court explained in *Dukes* that

> claims for individualized relief . . . do not satisfy the Rule. The key to the (b)(2)
> class is "the indivisible nature of the injunctive or declaratory remedy warranted—
> the notion that the conduct is such that it can be enjoined or declared unlawful only
> as to all of the class members or as to none of them." Nagareda, 84 N.Y.U. L. REV.,
> at 132. In other words, Rule 23(b)(2) applies only when a single injunction or
> declaratory judgment would provide relief to each member of the class. It does not
> authorize class certification when each individual class member would be entitled
> to a different injunction or declaratory judgment against the defendant. Similarly,
> it does not authorize class certification when each class member would be entitled
> to an individualized award of monetary damages.

*Dukes*, 131 S. Ct. at 2557.

To satisfy Rule 23(b)(2)'s cohesiveness requirement, a plaintiff must show that "(1) the

defendant's actions . . . are generally applicable to the class as a whole and (2) injunctive [or

declaratory] relief predominates over damages sought." *In re Rodriguez*, 695 F.3d 360, 365 (5th

Cir. 2012) (citing *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000)). Thus, while

"monetary relief may be obtained in a [Rule 23](b)(2) class action so long as the predominant relief

sought is injunctive or declaratory," Rule 23(b)(2) is not appropriate when "'final relief relates

exclusively or predominately to money damages.'" *Allison v. Citgo Petroleum Corp.*, 151 F.3d

402, 411 (5th Cir. 1998); *see Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978 (5th Cir. 2000)

(quoting FED. R. CIV. P. 23 advisory committee's notes). Accordingly, "[c]ases interpreting Texas

Rule of Civil Procedure 42(b)(2) require the court to find the declaratory relief sought must predominate the monetary relief sought." *Bailey*, 83 S.W.3d at 856.[31]

"The underlying premise of the (b)(2) class—that its members suffer from a common injury properly addressed by class-wide relief—'begins to break down when the class seeks to recover back pay or other forms of monetary relief to be allocated based on individual injuries.'" *Allison*, 151 F.3d at 413 (quoting *Eubanks v. Billington*, 110 F.3d 87, 95 (D.C. Cir. 1997)). "[M]onetary relief must be 'capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.'" *In re Wilborn*, 609 F.3d 748, 757 (5th Cir. 2010) (quoting *Allison*, 151 F.3d at 415). Here, "[t]he amount that each plaintiff was charged . . . and any amount to be disgorged will depend on the specific circumstances of each class member and whether and how fees were imposed." *Id.*; *see Rodriguez*, 695 F.3d at 366.

## B.     The Ryans' Argument

The Ryans argue that application of *Allison* to the facts of this case should lead this Court to the conclusion that injunctive relief predominates. In support, they cite *In re Bratcher*, 365 F.3d

---

[31]In *Dukes*, the Supreme Court questioned whether monetary relief would ever be recoverable under a Rule (b)(2) class for injunctive or declaratory relief. *See Dukes*, 131 S. Ct. at 2557 ("Our opinion in *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994) (per curiam) expressed serious doubt about whether claims for monetary relief may be certified under [Rule 23(b)(2)]. We now hold that they may not, at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief."). Moreover, the Supreme Court observed, but did not affirm or reject, *Allison*'s holding "that a (b)(2) class would permit the certification of monetary relief that is 'incidental to requested injunctive or declaratory relief.'" *Id.* at 2560. Rather, the Supreme Court declined to answer that question because the monetary relief in that case was not incidental to the injunctive relief requested, "even assuming, arguendo, that 'incidental' monetary relief can be awarded to a 23(b)(2) class." *Id.* at 2561. Because neither the United States nor the Texas Supreme Courts have subsequently held that monetary damages incidental to injunctive or declaratory relief are not recoverable under Rule 42(b)(2), we assume that they are.

408 (5th Cir. 2004). In *Bratcher*, plaintiffs challenged defendants' alleged practice of paying lower benefits and charging higher premiums to African-American consumers in the sale of low-value life insurance. The plaintiffs sued several insurance companies on the claims that they (1) "plac[ed] blacks in industrial policies offering the same benefits as do policies sold to whites, but at a higher premium (dual rates)," or "placed blacks in specially-designed substandard industrial policies providing fewer or lower benefits than do comparable plans sold to whites (dual plans)." *Id.* at 412. These practices were "memorialized in the insurer's rate books and records, which explicitly distinguish[ed] dual rate and dual plan policies by race." *Id.* Plaintiffs sought injunctive and declaratory relief and requested "restitution of past premium overcharges or benefit underpayments." *Id.* at 413.

In analyzing whether injunctive relief predominated, the Fifth Circuit noted that the class members were not "entitled to a one-size-fits-all refund" and that individual damages would depend on the idiosyncracies of the particular dual rate or dual plan policy and the age at which a class member purchased a dual rate policy. *Id.* at 418–19. Even though "thousands" of restitution grids or standardized formulas would be required to prove up the damages, the Fifth Circuit concluded that the Rule 23(b)(2) class should nevertheless be certified because the calculation of damages would "'neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations.'" *Id.* at 419 (quoting *Allison*, 151 F.3d at 415). It reasoned:

> In the list of policy variables cited by defendants and the district court, none requires the gathering of subjective evidence. This is not, for example, like *Allison*, a title VII case in which class members' claims for compensatory and punitive damages necessarily "implicate[ ] the subjective differences of each plaintiff's circumstances." Rather, assuming that unlawful discrimination is found, class

members automatically will be entitled to the difference between what a black and a white paid for the same policy. Not coincidentally, such damages flow from liability in much the same manner that an award of backpay results from a finding of employment discrimination.

We are well aware that, as *Allison* qualifies, the calculation of monetary damages should not "entail complex individualized determinations." Although it is arguable that the construction of thousands of restitution grids, though based on objective data, involves the sort of complex data manipulations forbidden by *Allison*, we read *Allison* to the contrary. The policy variables are identifiable on a classwide basis and, when sorted, are capable of determining damages for individual policyowners; none of these variables is unique to particular plaintiffs. The prevalence of variables common to the class makes damage computation "virtually a mechanical task."

*Id.* at 419 (alteration in original) (citations omitted) (footnotes omitted). Because they only "seek a declaration that Hicks is not entitled to any of the fees which the court prohibited him from collecting," the Ryans argue that, as in *Bratcher*, every member of the class would be entitled to an automatic refund of the fees paid for enjoined services, and there would be no need for additional hearings, extrinsic evidence, or individualized inquiries.

C.    **Resolution of the Arguments**

1.    **Certification Is Not Proper Under Rule 42(b)(2) Because Claims for Damages Already Before the Court Cannot Be Shoehorned Into a Claim for Declaratory Relief Under Rule 42(b)(2).**

In *Bratcher*, the primary relief sought by the class was an injunction prohibiting racial discrimination in the collection of premiums and payment of policy benefits; the recovery of overpaid premiums and underpaid policy benefits was secondary to that injunctive relief. In the present case, the Ryans do not seek injunctive relief; indeed, they do not need to because the 114th Judicial District Court has already enjoined Hicks from providing the prohibited services. Thus,

44

the class members already have the injunctive relief they need. Instead, the Ryans seek a declaration on behalf of the class (1) that Hicks violated the injunction and (2) that the Milne Defendants, who were not parties to the injunction, violated the injunction by failing to employ Hicks.

Yet, these same arguments are the basis of the breach of fiduciary duty and civil conspiracy claims already before the trial court. "A declaratory judgment action is not appropriate where plaintiff's cause of action is mature and enforceable in a pending suit that involves the same parties and the same issues as alleged in the declaratory judgment action." *Tucker v. Graham*, 878 S.W.2d 681, 683 (Tex. App.—Eastland 1994, no writ) (holding that plaintiff cannot bring cause of action for violation of statute based on nuisance and seek declaratory judgment that defendant created nuisance); *see Ysasaga v. Nationwide Mut. Ins. Co.*, 279 S.W.3d 858, 863 (Tex. App.—Dallas 2009, pet. denied) (citing *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990)); *Tex. Dep't of Pub. Safety v. Alexander*, 300 S.W.3d 62, 78 (Tex. App.—Austin 2009, pet. denied) ("Declaratory judgment is inappropriate if it would add nothing to the injunctive or other relief sought."); *Silver Lion, Inc. v. Martinez*, No. 14-05-00746-CV, 2007 WL 665253, at *4 n.6 (Tex. App.—Houston [14th Dist.] Mar. 6, 2007, no pet.) (mem. op.); *Barnett v. City of Colleyville*, 737 S.W.2d 603, 607 (Tex. App.—Fort Worth 1987, writ denied). Moreover, a plaintiff cannot shoehorn a claim for money damages into a Rule 42(b)(2) class. *See Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000) (expressing concern that "plaintiffs may attempt to shoehorn damages actions into the Rule 23(b)(2) framework, depriving class members of notice and opt-out

45

protections"). To hold otherwise would blur the carefully-crafted distinctions between the three

subsections of Rule 42(b).[32]

### 2. Certification Is Not Proper Under Rule 42(b)(2) Because the Ryans Do Not Claim the Injunction Is Ambiguous or that it Required Clarification Via Declaratory Judgment

Section 37.004 of the Civil Practice and Remedies Code, which is the Texas declaratory

judgment statute, provides:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004 (West 2015). A declaratory judgment is remedial

in nature, and "its purpose is to settle and to afford relief from uncertainty and insecurity with

respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002

---

[32]The United States Court of Appeals for the Fifth Circuit has described the process by which Federal Rule 23(b) was drafted:

> Under Rule 23, the different categories of class actions, with their different requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all. *See Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2246, 138 L.Ed.2d 689 (1997); *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 402–03, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); Rutherglen, *Title VII Class Actions,* 47 U. Chi. L.Rev. 688, 697–98 (1980) (citing Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure,* 81 Harv. L.Rev. 356, 387–92 (1967)). The different types of class actions are categorized according to the nature or effect of the relief being sought.

*Allison,* 151 F.3d at 412.

(West 2015). "A declaratory judgment should not be rendered when there is no claim that a statute is ambiguous or invalid." *Alexander*, 300 S.W.3d at 78.

Here, the Ryans did not argue that the 2001 injunction was ambiguous or invalid. Rather, they assert:

> It is undisputed that throughout the class period, Hicks was neither an attorney nor an employee of an attorney. It is likewise undisputed that he provided the very services which the court [forbade] him to provide to every member of the class and that every member of the class paid him a fee for those services. Appellees seek a declaration that Hicks is not entitled to any of the fees which the court prohibited him from collecting.

Consequently, the Ryans have not stated a claim within the terms of Section 37.004. For that reason, they are not entitled to certification of a class seeking that relief under Rule 42(b)(2).[33]

## VII. Conclusion

For the reasons set forth above, we find that the trial court erred in certifying a class action under Rule 42(b)(3) as to the Ryans' DTPA unconscionability claim and in certifying a class action under Rule 42(b)(2) as to the Ryans' declaratory judgment claim. We find that the trial court correctly certified a class action under Rule 42(b)(3) as to the Ryans' breach of fiduciary duty claims against the Hicks Defendants. Finally, neither Defendant appealed the trial court's order certifying a class of persons asserting joint enterprise, civil conspiracy, and aiding and abetting claims against the Milne Defendants, so we do not disturb that ruling.

---

[33]As noted previously, an appellate court reviewing an order certifying a class action does not decide the merits of the case itself. *St. Louis S.W. Rwy.*, 929 S.W.2d at 30. Accordingly, we do not decide whether the Ryans' liability claims have merit, but only that the Ryans may not duplicate their Rule 42(b)(3) breach of fiduciary duty claim as a declaratory judgment action under Section 37.004 in a Rule 42(b)(2) class action.

Accordingly, we (1) reverse the portion of the trial court's order certifying class claims of unconscionability against the Hicks Defendants and creating a mandatory Rule 43(b)(2) class, (2) affirm the remainder of the trial court's certification order, and (3) remand the matter to the trial court for further proceedings consistent with this opinion.


Ralph K. Burgess
Justice


Date Submitted:     July 29, 2015
Date Decided:       October 15, 2015